Lewis Thurston Anderson and Clyde Velma Anderson v. Commissioner. Lewis Thurston Anderson v. Commissioner.
Anderson v. Commissioner
Docket Nos. 35385, 35386.
United States Tax Court
T.C. Memo 1956-178; 1956 Tax Ct. Memo LEXIS 111; 15 T.C.M. (CCH) 922; T.C.M. (RIA) 56178; July 31, 1956
*111 Determination of income upon basis of net worth increase held justified. Amounts determined by respondent modified in certain respects. Additions to tax determined by respondent for fraud, failure to file return, failure to file declarations of estimated tax and for underestimation of tax, approved as to some years and disapproved for others. Statute of limitations held to bar assessment and collection of tax for some years. Edward C. Cushman, Esq., Johnson Building, Aiken, S.C., L. E. McNatt, Esq., and Thomas R. Spillane, C.P.A., for the petitioners. Herman Wolff, Jr., Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion The respondent has determined deficiencies in income tax and additions thereto for the calendar years and in the amounts as follows: Additions
Year
Deficiency
50 Per Cent
25 Per Cent
in Tax
Sec. 293(b)
Sec. 291(a)
1941
$ 838.80
$ 419.40
1942
4,477.86
2,238.93
1943 (Income and Victory
Tax)
4,721.87
2,360.94
1944
744.79
372.40
1945
23,552.32
11,776.16
1946
17,747.47
8,873.74
1947
26,532.30
13,266.15
$6,633.08
1948
10,968.96
5,484.48
The deficiencies have been determined on the basis of increases in the net worth of the petitioner, Lewis Thurston Anderson, plus living expenses, *112 less allowable deductions. The petitioner alleges a number of errors in the determination, among which are the valuation of notes secured by deeds included in assets, failure to allow full costs of properties sold, inclusion of assets that were not those of the petitioner, failure to allow capital gains treatment and installment basis with respect to real estate sales, failure to consider the full amount of cash on hand; and to make allowance for all liabilities. The petitioner denies that there was fraud, on ground for the determination of the 25 per cent addition for the year 1947, and asserts that assessment and collection are barred by the statute of limitations for 1941, 1942 and 1943. By amendment to his answers the respondent asserts liability for additions by reason of failure to file declarations of estimated tax for 1947 and 1948, and for understimates of estimated tax for 1943, 1946, 1947 and 1948. He also asserts that, under section 6 of the Current Tax Payment Act of 1943, the deficiency for 1943 should be increased in the event we decide there was no fraud for the year 1942. He claims increased deficiencies resulting from such additions. Findings of Fact At the hearing *113 a few of the facts were stipulated and are found as stipulated, the stipulations being incorporated herein by this reference. Lewis Thurston Anderson, usually referred to herein as the petitioner, is a resident of Augusta, Georgia. During the years 1941 to 1948, inclusive, the petitioner and Clyde Velma Anderson ere husband and wife. For each of the years 1941 to 1946, inclusive, the petitioner filed an income tax return, Form 1040, with the collector of internal revenue for the district of Georgia. For the year 1947 the petitioner did not file a declaration of estimated tax or an income tax return. For the year 1948 the petitioner and his wife filed a joint income tax return with the collector for the district of Georgia. The petitioner filed declarations of estimated tax for the years 1943, 1944, 1945 and 1946. He did not file a declaration of estimated tax for the year 1948. The petitioner had a high school education. Prior to 1917 he learned the jewelry business from an older watchmaker in Wrens, Georgia. He received no pay while learning the business. In 1917 he moved to Augusta, Georgia, where he was employed as a skilled watchmaker and jeweler which employment he continued *114 until 1946. Shortly after starting employment in Augusta, his salary was $55 per week. When he discontinued his employment in 1946 it was $70. During the latter part of his period of employment he worked on a part-time basis. In his income tax returns the petitioner reported salary and other compensation for personal services in the following amounts: Year
Amount
1941
$1,935.00
1942
2,448.00
1943
2,860.00
1944
$3,200.00
1945
3,585.00
1946
1,248.31
No amount was shown on the 1948 return as compensation for services. The petitioner commenced acquiring real estate in and around Augusta, Georgia, at the time he moved to that city. His earliest acquisitions were for the purpose of producing rental income. Some of the houses he acquired at first were run-down and burned houses. He also acquired some tracts with timber on them. The acquisition of real estate by the petitioner was a continuous process, at least from 1926 on. Some of the rental properties that he owned in some of the taxable years were on Emmett Street, Chaffee Avenue, Heckle Street, Cooper Street, Calhoun Street, Tuttle Street, and East Boundary Street. Prior to 1946 he also acquired a tract of at least 50 acres on the Sand Bar Ferry *115 Road outside of the city of Augusta. He subdivided the Sand Bar Ferry tract into 60 building lots and constructed houses on it, some of which were initially built for rental and some for sale. He also owned at least 11 rental houses in what was known as Druid Hills and 7 houses in Brookside, both in Aiken County, South Carolina. In that country he also owned two tracts of land that aggregated 201 acres, and had a one-half interest in another tract of 767 acres. In McCormick County, South Carolina, he acquired 132.5 acres of land in 1941 and an additional 80 acres in 1946, both of which he continued to own through the taxable years. In Jefferson County, Georgia, he owned a store building that he inherited from his father in 1929, and which was rented throughout the period 1941 to 1948. The rentals on some of his properties in Augusta were collected for him by a real estate firm. At the close of each year listed below the petitioner owned parcels of real estate in the numbers and having total costs as follows: Aiken
McCormick
Jefferson
Richmond
Year
No.
County
No.
County
No.
County
No.
County
1940
30
$34,425.02
1
$2,300.00
22
$28,528.92
1941
32
36,125.02
1
$ 425.00
1
2,300.00
23
30,403.92
1942
28
31,575.85
1
425.00
1
2,300.00
23
35,628.92
1943
28
31,575.85
1
425.00
1
2,300.00
25
37,277.95
1944
29
33,575.85
1
425.00
1
2,300.00
28
52,185.45
1945
14
18,410.01
1
425.00
1
2,300.00
21
40,213.51
1946
11
13,198.27
2
1,225.00
1
2,300.00
17
31,427.07
1947
8
6,823.27
2
1,225.00
1
2,300.00
16
28,389.51
1948
8
6,806.30
2
1,225.00
1
2,300.00
15
26,192.59
*116 In addition to the above properties, the petitioner owned houses in the Sand Bar Ferry tract that he had constructed for the purpose of renting, in the numbers and at costs, as follows: No.
Aggregate
Year
Houses
Cost
1942
9
$18,000.00
1943
11
22,000.00
1944
11
22,000.00
1945
11
22,000.00
1946
9
18,000.00
1947
3
6,000.00
1948
None
None
In addition to the properties above listed, the petitioner owned houses at December 31, 1946, in the Sand Bar Ferry tract either completed or under construction in which he had an investment at that date of $30,000. In the years 1946, 1947 and 1948, the petitioner sold houses in the Sand Bar Ferry Road tract that he had constructed for sale, the costs of which were as follows: Houses Sold
1946
1947
1948
$ 3,471.40
$ 4,711.33
$ 6,000.00
5,504.00
4,943.99
5,500.00
4,350.00
5,641.96
5,500.00
3,950.00
5,176.65
4,500.00
4,711.33
3,751.62
4,500.00
6,456.27
4,000.00
5,760.00
4,350.00
$17,275.40
$54,003.15
$21,500.00 These houses, and three more that he had on hand at December 31, 1948, which three had been constructed at a total cost of $15,600, were the only houses that the petitioner constructed primarily for sale. They were built in the River Side Park subdivision of the Sand Bar Ferry Road tract. They were *117 built by the petitioner in order to enable him to dispose of the land which was the back part of the tract. In the years 1942 to 1948, inclusive, the petitioner also sold parcels of real estate and unimproved land as listed below. The aggregate number of parcels, selling prices, costs, amounts of depreciation and gains were as follows: No.
Selling
Year
Parcels
Price
Cost
Depreciation
Gain
1942
5
$10,300.00
$ 7,599.17
$ 977.00
$ 3,677.83
1943
2 *
5,600.00
4,300.97
30.00
1,329.03
1944
1
1,850.00
1,625.00
235.12
460.12
1945
21
48,950.00
29,512.80
7,746.25
27,183.45
1946
12
29,696.80
21,244.70
2,351.25
11,803.35
1947
13
51,650.00
23,661.59
3,931.25
31,919.66
1948
5
18,316.66
6,257.78
660.00
12,718.88
Each of the parcels referred to in this paragraph had been held by the petitioner for more than six months at the date it was sold. Some of the parcels were improved and some were unimproved. Each of the parcels that had a house on it had been rented before it was sold. In most every case of the sale of these properties, the purchaser or a relative of the purchaser approached the petitioner with an offer to *118 purchase the property. The petitioner sometimes paid a commission on such sales to persons who were not real estate agents. He sold to anyone who wanted to buy. He sometimes sold without receiving a down payment. The petitioner was engaged in the business of buying and selling real estate. All the real estate sold by him was property held by him primarily for sale to customers in the ordinary course of that business. In his income tax returns the petitioner reported very few sales of real estate or gains thereon. He reported sales and gain or loss as follows: Gain or
Year
No. Sales
(Loss)
1941
None
None
1942
2
($107.00)
1943
2 *
1.75
1944
1
None
1945
None
None
1946
None
None
1947
(No Return
Filed)
1948
9
645.93 On his return for the year 1942, the petitioner showed two sales. One sale resulted in a gain and the other in a loss. The sale resulting in a gain involved property at 822 Chaffee Avenue which was reported by the petitioner at a gain of $250. The cost of this property was $2,250 and the selling price *119 was $2,500. The petitioner took back a security deed on this sale in the amount of $1,000, which was satisfied in 1944. The gains on the sales made in 1948 were reported on the installment basis. The gross profit on the 1948 sales were shown in a schedule attached to the return in the amount of $15,983.35. Among the properties sold by the petitioner, the security deeds covering which were satisfied during the years in question before us were: 1111 Emmett Street, sold in 1945, security deed satisfied in 1946; 412 Sand Bar Ferry, sold in 1945, security deed satisfied in 1946; property in Brookside sold to Truluck in 1945, security deed satisfied in 1946; property in Forest Place sold to Crapps in 1946, security deed satisfied in 1948; property in Druid Hills sold to J. R. Richardson in 1945, security deed satisfied in 1947; 520 Tuttle Street sold to Copeland in 1944, security deed satisfied in 1947; property in Druid Hills sold to B. Richardson in 1945, security deed satisfied in 1947; and property in Brookside sold to Jolley in 1946, security deed satisfied in 1947. The petitioner filed no return for 1947. The returns for 1946 and 1948 do not include any amount as gain upon the sales *120 of properties, the security deeds for which were satisfied in those years. Nor do such returns show that any amount received by the petitioner in payment of those security deeds was reported as interest. The amounts of taxable interest shown by the petitioner on his returns were as follows: Interest Shown
Year
on Returns
1941
$ 187.00
1942
156.48
1943
90.00
1944
* 202.00
1945
* 712.50
1946
60.00
1947
No Ret. Filed
1948
9,096.99
The petitioner does not have complete records of the houses that he owned in the taxable years. In each year for which he filed an income tax return he claimed deductions for depreciation on buildings at rates ranging from two to three percent. The returns do not set forth any figures which purport to show the costs of the depreciable properties. They set forth as to each property a figure denominated as "total value" of land and improvements, which is then separated into two figures, one for land and the other for buildings, and depreciation is computed on the latter figure. The stipulated accumulated amounts of depreciation on the petitioner's properties at the close of each year by counties in which the properties were located, were as follows: Richmond
County
Richmond
Jefferson
Aiken
(Sand Bar
Year
County
County
County
Ferry Rd.)
1940
$ 7,888.32
$ 720.00
$3,976.42
1941
8,804.02
780.00
5,305.47
1942
9,673.72
840.00
5,394.82
$ 360.00
1943
10,657.09
900.00
6,449.19
1,080.00
1944
11,761.13
960.00
7,503.56
1,960.00
1945
7,271.00
1,020.00
4,012.74
2,840.00
1946
5,429.53
1,080.00
2,989.25
3,160.00
1947
5,652.31
1,140.00
853.92
880.00
1948
5,406.01
1,200.00
950.59
On *121 his sales of real estate the petitioner received from the purchasers security deeds to secure notes for the unpaid portion of the purchase price. The notes bore interest at varying rates from five per cent to eight per cent. At the close of each of the years listed below the petitioner owned security deeds acquired in connection with real estate sales in the several counties listed in the numbers and face amounts as follows: Aiken
Richmond
Jefferson
Year
No.
County
No.
County
No.
County
Totals
1940
0
1
$ 1,926.00
1
$425.00
$ 2,351.00
1941
0
1
1,710.00
1
425.00
2,135.00
1942
2
$ 3,438.62
1
1,000.00
1
425.00
4,863.62
1943
2
3,307.54
2
3,132.97
0
6,440.51
1944
2
3,130.70
2
3,456.45
0
6,587.15
1945
15
29,330.67
8
14,464.97
0
43,795.64
1946
17
32,056.18
13
26,744.30
1
107.00
58,907.48
1947
16
27,854.72
31
99,600.56
1
107.00
127,562.28
1948
15
25,325.87
39
140,574.05
0
165,899.92
Some of the above security deeds were on property in the Sand Bar Ferry tract. That tract was outside of the city limits and the houses built thereon were not subject to the city building code. They were sub-standard in construction and materials. They did not have footings, and such pillars as they had consisted of concrete blocks, some without mortar, and were not at the bearing points. *122 The floor joists and rafters were two feet apart. The window and door frames were not mill-made, but were made out of whatever lumber was handy. The window sashes were of an obsolete type, with the upper pane stationary; they had no weights or balances. The houses had no baths or other sanitary facilities. The streets in the area were unpaved, and there were no street lights. No real estate firm in Augusta has ever sold any of the petitioner's houses in the Sand Bar Ferry Road area. The houses could not qualify for F.H.A. loans. Savings and loan associations would not make improvement loans on the properties, and returned the fees that were paid with applications for loans. The occupants of the properties were in low-income brackets. The houses were sold at prices in excess of their fair market values. The purchasers were willing to agree to the selling prices because the down payments were low and in some cases no down payment was required. The purchasers were interested primarily in the amount of the monthly payments. Houses owned by the petitioner in Augusta, Georgia, some of which he sold in the taxable years, and on which he took back security deeds, for the most part were also *123 of sub-standard construction. Some of them had been built 50 or 60 years ago to rent at $15 or $20 per month. Some of the properties were badly run down. Some were rented at monthly rentals of from $4 to $7. The petitioner's properties, generally, were properties that were hard to finance. The security deeds held by the petitioner on properties that were sold by him had a fair market value of 70 per cent of their face amounts. The petitioner owned other security deeds, given to secure debts owed to him which were not the result of real estate sales, on real estate in the counties listed, in the numbers and amounts as follows: Aiken
Richmond
Jefferson
Burke
Year
No.
County
No.
County
No.
County
No.
County
1940
1
$1,250.00
2
$ 315.00
2
$615.80
1
$500.00
1941
6
2,075.00
4
1,790.00
2
615.80
1
500.00
1942
4
650.00
2
915.00
1
500.00
1943
2
395.00
1
800.00
1944
2
950.00
1945
2
1,000.00
3
1,250.00
1946
5
5,310.74
6
6,486.88
1947
2
7,474.59
5
3,280.93
1948
2
6,985.20
4
2,279.44
The petitioner's mother and a daughter owned security deeds on property in the counties listed below in the face amounts shown which deeds were recorded in the name of the petitioner: Aiken
Richmond
Jefferson
Year
County
County
County
1940
$675.00
1941
$1,219.35
$2,000.00
675.00
1942
700.00
4,706.75
1943
1,118.00
4,841.75
1944
154.00
6,306.75
1945
315.00
6,011.75
1946
800.00
3,121.75
1947
800.00
3,031.75
1948
800.00
3,680.00
*124 The face amounts of these deeds were treated by the respondent as assets of the petitioner in determining the net worth of the petitioner. They were not the property of the petitioner and are not included in the amounts we have set out in the preceding paragraphs as property of the petitioner. At the close of each year there were loans owing to the petitioner other than loans on security deeds in numbers and amounts as follows: Year
Nos.
Amount
1940
9
$2,048.56
1941
6
823.56
1942
5
608.56
1943
4
424.26
1944
4
610.00
1945
3
358.00
1946
2
953.00
1947
1948
In the years 1940, 1941 and 1942, the petitioner's only investment in securities was the amount of $1,020.50 in Salisbury, North Carolina, notes or warrants. In 1943 his total investments amounted to $1,311.25 which consisted of the same amount in Salisbury, North Carolina, notes as in prior years, $272.00 in Georgia Railroad Banking & Trust Co. stock and $18.75 in a United States Government bond. In 1944 he had the same investments as in 1943 plus the amount of $400.00 in the note of an individual. His investments in securities in the years 1945 to 1948, inclusive, were as follows: 1945
1946
1947
1948
Georgia Power Company
$ 6,626.50
$ 6,626.50
Georgia Power Company
2,513.50
2,513.50
Georgia Power Company
1,035.00
1,035.00
Georgia Power Company
1,145.00
1,145.00
Georgia Power Company
2,295.00
2,295.00
Georgia Power Company
114.25
Ga. RR Banking & Trust Co.
$ 272.00
$ 272.00
272.00
272.00
American Tel. & Tel.
306.00
American Tel. & Tel.
815.00
815.00
815.00
815.00
American Tel. & Tel.
3,270.00
3,270.00
3,270.00
3,270.00
Salisbury, N.C.
1,020.50
1,020.50
1,020.50
1,020.50
John P. King Mfg. Co.
380.00
380.00
H. H. Claussons Sons, Inc. 5%
Pfd
500.00
500.00
Castleberry Foods 5 1/2%
500.00
500.00
Bibb Mfg. Co. Com
1,190.00
1,190.00
Detroit Edison Com
1,025.00
U.S. Govt. Savings Bond
18.75
18.75
18.75
18.75
Boston Edison Company
803.56
803.56
803.56
803.56
Savannah-Augustine Gas Co.
700.00
South Atlantic Gas Co.
700.00
700.00
700.00
South Atlantic Gas Co.
324.00
324.00
324.00
South Atlantic Gas Co.
252.00
252.00
M. B. Norris (Note)
400.00
400.00
400.00
400.00
M. B. Norris (Note)
1,500.00
1,500.00
1,500.00
1,500.00
$10,369.81
$10,693.81
$23,990.81
$26,436.06
*125 The petitioner handled and invested funds of his mother and sister. He rendered detailed accounts to both his mother and sister for moneys of theirs that he handled and for funds that he expended in their behalf. He accounted for items as small as ten cents. The petitioner did not furnish any of the funds that he invested in securities for his mother and sister, although some of the securities were listed in the petitioner's name. The petitioner's mother and sister had investments in securities in total amounts as follows: Mother
Sister
Year
Amount
Year
Amount
1940
$ 1,983.90
1940
1941
1,983.90
1941
1942
500.00
1942
1943
4,089.50
1943
1944
4,497.50
1944
$ 765.00
1945
9,536.50
1945
1,248.64
1946
14,592.75
1946
1,248.64
1947
13,582.75
1947
1,514.14
1948
14,786.75
1948
1,514.14 These amounts were treated by the respondent as assets of the petitioner in his determination of the deficiencies. They were not the property of the petitioner and are not included in the amounts we have set forth above as investments of the petitioner. At the close of each of the following years balances in the petitioner's bank accounts in banks in Augusta were as follows: C & S Bank
C & S Bank
Ga. RR Bank &
Augusta -
Year
Augusta [1] *126 Trust Company [2]
Personal [3]
1940
$ 61.25
$ 207.63
$142.24
1941
36.41
1,613.27
1942
38.96
269.52
1943
38.96
510.27
1944
38.96
344.05
1945
243.06
442.17
1946
550.93
617.67
1947
1,082.91
760.77
1948
2,379.74
1,201.59
At the close of each year the petitioner was indebted on notes payable as follows: C & S
Ga. Rail-
Bank
road Bank
Year
Augusta
Augusta
Others
Total
1940
$1,721.45
$ 506.25
$ 800.00
$ 3,027.70
1941
405.06
3,594.39
600.00
4,599.45
1942
1,316.37
1,468.26
4,350.00
7,134.63
1943
1,518.75
1,518.75
1944
2,019.00
6,325.83
1,800.00
10,145.73
1945
1,275.00
1,761.46
3,036.46
1946
5,522.92
6,869.00
12,391.92
1947
2,025.00
2,025.00
4,050.00
1948
At the close of the years 1946, 1947 and 1948 the petitioner had outstanding accounts payable for building supplies as follows: 1946
$2,832.18
1947
2,861.08
1948
3,923.72
The petitioner from time to time submitted statements of his financial condition to the Citizens & Southern National Bank for credit purposes. Each report purports to show the petitioner's assets and liabilities in considerable detail. The following statement of his condition as of December 31, 1944, is typical of all of them: This statement is made for the purpose of obtaining credit.
1943 Real estate owned, less one piece sold. $83,950.00 less
$ 83,450.00
$500.00
1944 New real estate added.
16,150.00
Loans of real estate
9,780.00
Stocks and bonds at cost (Old)
521.00
Central R. R. and Banking Co. Bonds
975.00
Loans on gold and silver made before 1940
906.00
Wholesale watch material for resale - Estimated
150.00
Gold coins held as relics
100.00
New loans on gold made in 1943
140.00
Cash on hand and in banks and checks
919.00
Lumber and plumbing supplies bought before the war for keeping
up real estate - Estimated
1,000.00
Total assets
$114,091.00
Mules, feed, cows, wagon, auto, truck, tools, not listed
Total liabilities
$ 8,900.00
Net worth
$105,191.00
Net worth one year ago.
94,862.26
Net gain for one year
$ 10,328.00
The real estate above is listed at cost some is old and some is
new.
Hence, my idea of depreciations is now
$ 10,000.00
After Depreciation
$ 328.00
*127 The pertinent figures from other financial statements in the taxable period are as follows: Mortgage
Real
Total
Dec. 31
Cash
Loans
Estate
Assets
Liabilities
Net Worth
1940
$ 314.88
$ 8,960.96
$61,929.00
$ 73,112.60
$ 3,150.00
$ 69,962.60
1941
1,860.27
8,001.96
65,087.18
76,816.17
3,850.00
72,966.17
1942
130.00
7,633.50
75,177.00
87,177.02
5,375.00
76,802.02 a
1943
1,342.25
8,009.26
83,950.00
97,612.26
3,750.00
81,862.26 b
1945
53,089.00
69,313.00
141,886.50
2,450.00
139,436.50
1946
751.93
101,461.00
53,713.00
182,810.43
72,900.00 c
109,910.00
1947
500.00
50,000.00
21,805.00
96,062.00
4,500.00
91,562.00
1948
800.00
51,000.00
21,805.00
97,362.00
4,000.00
93,362.00
The financial statements did not include any assets inherited by the petitioner from his father. The petitioner's father died intestate in 1929. The father's estate consisted of three store properties in Wrens, Georgia, the home place - which was a farm - one or two other pieces of land or interests in land, some county warrants, and perhaps a negligible amount of cash. The estate was never formally appraised and there were no probate proceedings. In the distribution *128 of the estate the home place was acquired by the petitioner's mother. The petitioner, his sister and his mother each received one of the stores in Wrens, and the county warrants were divided among the three. The value of the petitioner's share of his father's estate was about $14,000 or $14,500. The store acquired by the petitioner from his father's estate was rented beginning in 1943 for $12.50 per month. The rental increased gradually over a nine-year period to $25 per month. The first income tax return filed by the petitioner was for the year 1939. That return was prepared by a certified public accountant whose services were engaged by the petitioner, and for which services he paid a fee. When the petitioner learned that he could obtain free assistance from Government employees in the preparation of his returns he went to them for aid in preparing his returns for the years 1940 to 1946. Schedules attached to the returns, on which were listed some items of income, and detailed statements of deductions claimed, including depreciation on individual rental properties, were prepared by the petitioner. The petitioner did not furnish any invoices to the persons who assisted him in preparing *129 his returns. In June 1947, the petitioner had conferences with revenue agents who were investigating his 1944 income tax return. At that time, and with the petitioner's consent, the agents made an inventory of the petitioner's safe deposit box in the Citizens & Southern Bank, and also an inventory of a safe deposit box in the joint names of the petitioner, his mother and his sister in the Georgia Railroad Bank & Trust Company. The agents also inventoried the contents of a safe in the petitioner's home. The boxes and the safe contained several coins, a deed pertaining to the division of some land and a few stock certificates. At the time of his conferences with the revenue agents in 1947, the petitioner employed an accountant in Augusta to help him in the matter of the investigation of his 1944 income tax return. The accountant requested that the petitioner bring in his records, and was advised by the petitioner that the revenue agents had his records. When it came time to prepare an income tax return for 1947, the petitioner advised the accountant that revenue agents had his records and that he could not file a 1947 return. The petitioner did not furnish the accountant with records *130 which would permit the preparation of a return for 1947. The only information ever furnished to the accountant as to the petitioner's 1947 income consisted of a few figures set forth in a letter dated September 24, 1949, as to rents collected, an amount stated to be total expenses and a depreciation schedule worked out in connection with the 1948 return. The petitioner's 1948 income tax return was prepared in the office of the accountant whom the petitioner had engaged with respect to his 1944 return. It was the petitioner's practice to make notes of financial transactions on slips or scraps of paper and later transcribe them into books. The books were paper-backed note books or composition books. The petitioner intended to keep one book for each calendar year, but some of the books contain entries pertaining to more than one year. The books were not kept in any consistent manner. Five such books were introduced in evidence. One of them contains nothing but notes and figures as to sales of real estate. Another contains what appear to be amounts received monthly as rentals, receipts of interest or dividends, and a list of amounts designated as "Water Bills" without further identification. *131 Another contains notes as to sales of real estate and dividends and interest received. Some entries are not dated and those that are dated are not all in chronological order. Entries with respect to sales of houses show the sale price of the property, the amount of the down payment, the amount of security deed given by the purchaser and the monthly payments made by the purchaser. In most instances the cost of the property is not shown. Amounts designated as material and labor are shown as monthly aggregates without further identification. None of the petitioner's record books contains a complete list of income and deductions for any year. The petitioner does not keep cancelled checks. Upon request of the revenue agents for records of income and expenses, the petitioner in June 1947, furnished them with three of his notebooks, one of which purports to contain records of sales from 1943 to 1945, another bore the caption "Income Tax Book - 1944," and the third has written on the cover "1946 to -." Two of the three books are in evidence and contain entries concerning sales of numerous parcels of real estate. The entries include the name of the purchaser, the street name and house number *132 of the property, the amount of the loan and payments made by the purchaser. In some instances a cost figure is shown; in others it is not. The book captioned "Income Tax Book - 1944" is not in evidence. The agents made a transcript of the books and returned them to the petitioner on January 30, 1948. The petitioner informed the revenue agents that he had no records other than the books he gave to them. The petitioner and his wife were married in 1918. They have two daughters. One of the daughters was married prior to the taxable years, but lived with the petitioner a short time during the war. The other daughter was born in 1929 and was claimed as a dependent on the petitioner's income tax returns for the years 1941 to 1946, inclusive. She was married in about 1950. The petitioner is a man of considerable frugality. His wife cuts his hair; only once in the past 25 years has he patronized a barber shop. He sharpens his razor blades and only uses about two a year. He obtains his shoes and hats from among the discards left by people who vacate his houses. He obtains his suits by sharing with his son-in-law the cost of suits on occasions when a dealer offers two suits for the price of *133 one plus $1.00. He obtains milk and butter from two cows that he owns and pastures on his land. His wife makes underwear for him out of used material. Calves are butchered and the meat is canned. The petitioner has a garden which supplies fresh vegetables in the growing season and vegetables are canned for winter use. The petitioner's only non-utilitarian expenditure is for corn cob pipes and tobacco, both of which he buys at wholesale. One of his daughters attended college and earned the funds for that purpose; the petitioner did not pay for her education. The petitioner's cash expenditures for living expenses for himself and family averaged about $1,000 per year in the taxable period. In his returns the petitioner reported income (net or gross) as follows: Year
Amount on Returns
1941
$ 1,426.03
net income
1942
2,390.80
net income
1943
2,060.91
net income
1944
4,754.05
gross income
1945
4,171.70
gross income
1946
1,596.01
gross income
1947
no return filed
1948
12,019.79
net income The respondent determined the petitioner's net income on the net worth basis. The following tabulation shows his determination of assets, liabilities and net worth at the end of each year and the increase in net worth in each year: *134 Increase in
Year
Assets
Liabilities
Net Worth
Net Worth
1940
$ 67,062.58
$13,782.02
$ 53,280.56
1941
76,746.73
17,127.29
59,619.44
$ 6,338.88
1942
95,419.89
21,057.31
74,362.58
14,743.14
1943
106,504.81
17,950.12
88,554.69
14,192.11
1944
123,213.46
29,128.45
94,085.01
5,530.32
1945
153,786.08
15,849.31
137,936.77
43,851.76
1946
196,706.54
20,803.76
175,902.78
37,966.01
1947
238,225.70
11,079.84
227,145.86
51,243.08
1948
273,468.72
6,808.84
266,659.88
39,514.02 The respondent in computing taxable net income eliminated as nontaxable income the amounts of $77.37 for 1942, $7.50 for 1945 and $589.08 for 1947. He allowed as deductions contributions for the years 1941, 1942 and 1943 the respective amounts of $197, $200, and $190. He allowed the standard deduction of $500 for each of the years 1944, 1945, 1946 and 1947, and the standard deduction of $1,000 for 1948. In accordance with the findings herein, which, in some respects modify the respondent's determinations, the correct amounts of the petitioner's assets, including security deeds in connection with sales of real estate at a value of 70 per cent of face amounts, his liabilities (including depreciation as stipulated), net worth at the end of each year and increase in net worth for *135 the taxable years are as follows: Increase in
Year
Assets
Liabilities
Net Worth
Net Worth
1940
$ 73,060.62
$15,612.44
$ 57,448.18
1941
79,222.98
19,488.94
59,734.04
$ 2,285.86
1942
95,039.34
23,403.17
71,636.17
11,902.13
1943
101,566.90
20,605.03
80,961.87
9,325.70
1944
118,751.56
32,330.42
86,421.14
5,459.27
1945
127,668.51
18,180.20
109,488.31
23,067.17
1946
161,815.83
27,882.88
133,932.95
24,444.64
1947
174,573.05
15,437.31
159,135.74
25,202.79
1948
206,987.52
11,480.32
195,507.20
36,371.46
The petitioner's net income for the taxable years determined by adding to the increases in his net worth the amount of his living expenses and allowing as deductions the amounts determined by the respondent as representing nontaxable income and allowable deductions is as follows: Year
Net Income
1941
$ 3,088.66
1942
12,624.76
1943
10,135.70
1944
5,959.27
1945
23,559.67
1946
25,944.64
1947
25,113.71
1948
36,371.46
The increases in net worth, plus living expenses and less nontaxable income, represent realized income that was properly to be included in gross income and only a part of which was reported in the returns that were filed. In his declarations of estimated income tax the petitioner reported estimates as follows: Year
Amount
1943
Income and Victory Tax
$145.36
1944
Income Tax
695.28
1945
Income Tax
216.72
1946
Income Tax
120.00
1947
None Filed
1948
None Filed
*136 Eighty per cent of the tax for each of the years 1943, 1946, 1947 and 1948 exceeds the estimated tax for each of those years. The returns for the years 1941 and 1944 were not false or fraudulent with intent to evade tax. The returns for the years 1942, 1943, 1945 and 1946 were false or fraudulent with intent to evade tax. Some part of the deficiency for each of the years 1942, 1943, 1945 and 1946 is due to fraud with intent to evade tax. No part of the deficiencies for the years 1947 and 1948 is due to fraud with intent to evade tax. Opinion Use of Net Worth Method ATKINS, Judge: The respondent has determined income, and consequent deficiencies, on the basis of increases in the petitioner's net worth plus esimated living expenses and less small amounts of nontaxable income, contributions for some years and the standard deduction for the years 1946, 1947 and 1948. We have set out in the findings some of the facts concerning the state of the petitioner's records. Bluntly stated, he had almost none, and the few that he had were not adequate for a complete or accurate calculation of his income. The only records which might be considered of a permanent nature consist of paper-backed composition *137 books for only some of the years under review and many of the notations in those are of no value in determining the amount of income realized in any year. While of little evidentiary value in determining the amount of income, they do indicate the receipt of substantial sums as payments on properties sold and support the respondent's position that more income was realized than was reported. The petitioner did not keep cancelled checks. He has not produced any receipts or cost records as to his numerous properties. The record shows that the respondent's agents requested the petitioner to produce records and so did the accountant whom he engaged in connection with the investigation of his 1944 return, and all that he ever produced were the composition books which are wholly inadequate for the purpose of computing income. In this situation the respondent was justified in attempting to reconstruct income by use of the net worth method. Although the petitioner's records may have been adequate for his business purposes, they obviously did not record many of the items of income realized from ownership and dealings in real estate. Holland v. United States, 348 U.S. 121. In our findings of *138 fact we have set forth tabulations of properties sold by the petitioner in the various years, as established by the record. The record does not support a finding that these were all the sales of property. Schedules submitted in evidence by the respondent in explanation of his determination contain many additional purchases and sales as to which the petitioner has offered no evidence. In our view the use of the net worth method by the respondent was fully justified as a test of the accuracy of the petitioner's income tax returns and also as evidence of his correct net income. Carmack v. Commissioner (C.A. 5), 183 Fed. (2d) 1, affirming a decision of this Court [8 TCM, Harris v. Commissioner this Court [8 TCM,]; Harris v. Commissioner (C.A. 4), 174 Fed. (2d) 70, affirming a decision of this Court [7 TCM, 16,333(M)]; Frank Imburgia, 22 T.C. 1002. Opening Net Worth The necessity of determining, with reasonable certainty, an opening net worth to serve as a starting point for the calculation of increases in net worth is too well established to require elaborate discussion. Holland v. United States, supra. The respondent determined that the petitioner's net worth at the beginning *139 of 1941 amounted to $53,280.56. This net sum was the difference between assets in the amount of $67,062.58 and liabilities of $13,782.02. The petitioner attacks this determination on a number of grounds, including alleged failure to include in assets all cash on hand, inclusion of assets that were owned by other members of the petitioner's family, and inclusion of security deeds at face amount rather than at their value. Some of the petitioner's attacks on the respondent's determination are made with reference to later years and these will be noticed as we go along. At the moment we are concerned only with facts as to the opening net worth for 1941 - the first taxable year before us. The only cash items used by the respondent consisted of the amounts in the two bank accounts in the aggregate amount of $268.85. Documentary evidence establishes that the petitioner had three bank accounts in 1940 in which the balances aggregated $411.12. We have so found. But the petitioner claims that he had much more than this amount of cash on hand at the beginning of the taxable period. He says that he had $20,000 or $22,000 in paper currency in sealed glass jars that were buried in the woods at places *140 known only to him. Appearing as a witness for himself, he testified as to sealing the jars with hot asphalt, donning hunter's clothing, burying the jars a specified distance from marked trees, and obscuring the marks of interment by burning litter which he used to heat canned food that he consumed on the spot. It is the petitioner's contention that his ownership of this much cash at the beginning of 1941 is corroborated by the fact that in 1942 and 1943 he expended respectively $18,000 and $6,000 in constructing houses. This does not, in our opinion, corroborate his story. The cash used for such construction need not necessarily have been on hand at the beginning of 1941. It may have been acquired from other sources during 1941, 1942 and 1943. The petitioner also makes the contention that there is some corroboration to his story in the statement which he made on a financial statement given to a bank that he could pay up all that he owned in a few hours during any business day. He stated that by this he meant that he could go and get the money from the ground. However, to us it does not seem logical that the petitioner, who was known for his inclination to economize, being known as *141 "Little Tight," would be borrowing money from the bank and paying interest if he had large sums buried. The evidence shows that in 1941 he owed banks about $4,000. We are unable to give credence to the petitioner's testimony that he had this amount of cash buried and we refrain from making any findings of fact concerning it. His story is not corroborated. Carmack v. Commissioner, supra, Frank Imburgia, supra.In this connection, we have taken into consideration all the evidence bearing upon the probability of the ability of the petitioner to accumulate such an amount of cash as of the beginning of the taxable year 1941. The only revealed regular source of any substantial income was salary from the petitioner's employment as a watchmaker. His salary range was $55 to $70 a week. However, he worked on a part-time basis in the later years. Thus, his return for 1941 shows an average income from salary of about $47 per week. Assuming that over the period 1918 to 1940 his average income from salary was $50 per week and assuming that his living expenses were not more than $600 per year, his accumulated savings could not have been much more than $40,000. Against this figure, the evidence *142 shows that he had purchased up to the end of 1940 property at a cost in excess of $60,000. This would have absorbed all the income from salary and more, and we are not informed as to other possible sources of the claimed cash on hand. Some point is made of his inheritance of a part of his father's estate in 1929. The amount of that inheritance the petitioner places at about $14,000 or $15,000, and it consisted of real estate, county warrants and cash. Although the petitioner says that he received some cash from his father's estate, he has no recollection of what amount it was, not even in round figures. His sister, who took an equal share of the father's estate, does not remember receiving any money other than from the county warrants that were in the estate. Two banks in which the father had deposits could not pay depositors. Had there been any sizeable sum of cash in the father's estate, certainly the petitioner or his sister could be expected to give at least an approximate figure. In the nebulous state of the evidence the only finding that we have been able to make is that the cash in the father's estate, if any, was a relatively small sum. On the record before us we cannot find *143 that at the beginning of the taxable period the petitioner had any cash other than that contained in his bank deposits. Increases in Net Worth Because of the petitioner's failure to supply the examining agents with the data that they requested, the agents resorted to other sources of information, including land records, in order to reconstruct his income. This was entirely proper. See Harris v. Commissioner, supra, in which it was pointed out that the repeated comparision of opening and closing net worth over a series of years lessened the chance of error that is inherent in net wroth computations of income. The evidence discloses that here, as in Harris, supra, there were some errors in the respondent's reconstruction, most of which stem from the petitioner's failure to produce evidence prior to the trial of the case. Where credible evidence was produced at the trial or the facts stipulated, we have corrected the respondent's determinations with the results that are set out in the findings of fact. Assets In the net worth computation prepared by the respondent there were included as assets of the petitioner on hand at the end of the various years a number of security deeds which *144 were in the name of the petitioner but which the petitioner testified belonged to his mother and his daughter and which were purchased by him for them with money furnished to him by them. The respondent on brief contends that there has been no proper showing that these belonged to the mother and daughter. We have carefully combed the voluminous record, including various exhibits which might bear upon this subject, and have found that the notations on bank records and the petitioner's statements of account with his mother corroborate his testimony as to the greater part of these security deeds. We have concluded from the whole record that none of these security deeds which he claims belonged to his mother and daughter did belong to him and have eliminated them from his assets in our reconstruction of his net worth. In the net worth statement prepared by the respondent there were included numerous investments in securities held at the end of the various years. The petitioner contends that the respondent erroneously included therein many securities which belonged to his mother and his sister. The petitioner submitted in evidence a list of the various securities owned by his mother and *145 sister and testified that none of these securities ever belonged to him. Here again we have meticulously checked the record against his testimony and find corroboration of such testimony in the petitioner's records of account with his mother and the broker's accounts. We are satisfied that these securities were not owned by the petitioner and we have so found in our findings of fact. Proper adjustment has been made in our reconstruction of the petitioner's net worth. The amounts of loans payable to the petitioner, other than on security deeds, have been stipulated in the amounts found in the facts and these amounts have been used in the reconstruction in place of those used by the respondent in his determination. Although the petitioner's books do not contain a complete record of the cost of the various properties and his returns did not contain such information, the parties have agreed upon most of the cost figures and such agreed cost figures have been found in the findings of fact. Where the costs have not been shown we have used the figures used by the respondent in determining the deficiencies. There are a few instances in which the parties are in disagreement. One of these concerns *146 a property listed in the exhibits as 400-402 Sand Bar Ferry Road. The house at that address had been constructed in 1942 at a cost of $2,000. It was sold in 1947 for a consideration which the revenue stamps on the deed indicated to be $6,000. The purchaser gave back a security deed in the amount of $5,700. Within the year 1947 the premises were deeded back to the petitioner for a nominal consideration, the petitioner apparently surrendering the security deed. The next day the purchaser acquired from the petitioner another property for a recited nominal consideration and gave back a security deed in the face amount of $4,700. The respondent has included the property at 400-402 Sand Bar Ferry Road in the petitioner's assets for the year 1947 at a cost of $5,700. The petitioner contends that this property should not be included at a greater amount than $2,000. We agree with the petitioner. For the purpose of determining the increase in the petitioner's net worth it would be a distortion to include the same house, under the circumstances, at a different figure at the beginning and the end of the year. We have used a cost of $2,000 for this property in determining the petitioner's net *147 worth for the year 1947. Another controversy relates to the cost of land on Sand Bar Ferry Road on hand at the end of the years 1946, 1947 and 1948. The amounts for which the petitioner contends are somewhat higher than those urged by the respondent and which were used in the notice of deficiency. Since there is no proof of the actual cost of these properties, the figures used by the respondent in his computation of net worth are approved and in the summary of the values of the properties in our findings of fact we have used the same figures for the properties as used by the respondent, namely, $4,326.00, $2,447.88 and $1,900.96 for the years 1946, 1947 and 1948, respectively. A further difference between the parties relates to the cost of houses on hand at the end of 1946. The respondent in the computation of the deficiency included among the properties owned by the petitioner at December 31, 1946, properties in Richmond County either constructed or in process of construction in the Sand Bar Ferry Road tract at a figure of $30,000. This was in addition to certain other properties in that county which we have found had a cost of $31,244.29 and also in addition to other houses on the *148 Sand Bar Ferry Road tract at a cost of $18,000. The petitioner contests the inclusion of this $30,000 amount and at the hearing much of the interrogation had to do with how this figure was computed. From a careful consideration of such testimony, we cannot conclude that the Commissioner acted arbitrarily in including this amount. We know from the record that in 1947 and 1948 there were sales of at least 15 houses in this county which had been constructed for sale and it is not unreasonable to assume that much of this property was on hand at December 31, 1946. The revenue agent testified that he did the best he could in attempting to fix this amount by referring to the public records, financial statements given by the petitioner to banks and by discussions with the petitioner. He concluded that there were at least 15 houses, the cost of construction of which would be about $4,000 each, but that he discounted the full cost because some of the houses might not have been completed. In discussing it with the petitioner, the revenue agent testified, the petitioner interposed no objection to the calculation. While it is true that there is no detailed showing as to all of the houses on hand *149 or when they were constructed, there is no evidence to show that the respondent's determination is unreasonable. The petitioner, who presumably would know what houses were on hand and when they were constructed, did not offer any evidence whatsoever to assist the Court in arriving at a conclusion upon this question. We accordingly approve the respondent's determination in this respect and have found as a fact that this amount of $30,000 should be included among the properties owned by the petitioner at December 31, 1946. As to the year 1947 the respondent asks for a finding that at the close of the year the petitioner had invested the sum of $12,000 in construction in progress and houses finished for sale. In our reconstruction of net worth for 1947 we have included in assets the amount of $10,500 as cost of houses constructed for rent and for sale. The petitioner's exhibits and the testimony and stipulation with regard thereto establish that figure as proper. The greatest difference between the parties, in dollar amounts, has to do with the amount at which the petitioner's security deeds should be included for the purpose of determining net worth. The respondent has included them *150 at their face amounts. The petitioner contends that they should not be included at any greater amount than 30 per cent of face value. The petitioner produced as witnesses real estate men who testified generally that the houses were of very poor construction, that the purchasers of the houses were not of the responsible type, that the agreed selling prices were in excess of the fair market values of the properties since the purchasers were more interested in the size of the down payment and the monthly payments than in the fixed selling price, that lending institutions did not care to make loans on this type of property and that the most that could be borrowed on property of this type would be about 30 per cent of its value. From this the opinion testimony was to the effect that the security deeds had a value of only 30 per cent of their face amounts. We are satisfied that the houses were sold in excess of their fair market values and that the security deeds taken back were not worth 100 per cent of face. The parties apparently are agreed that it is proper to include the security deeds at fair market value, and we see no reason to disagree. After all, the ultimate aim of this proceeding *151 is to determine the petitioner's correct tax liability, the amount of which depends upon the amount of his net income. Lacking the records which should be kept and used for the determination of net income, the increase in net worth method is used only because the increase presumably stems from the receipt of taxable income. The increase of net worth "is merely evidence of income," Estate of W. D. Bartlett, 22 T.C. 1228 and care must be exercised to confine the use of the method so as to reflect as nearly as possible all items of taxable income but at the same time to exclude those which do not represent income. Section 111(b) of the Internal Revenue Code of 1939 provides that the amount realized on a sale is the sum of any money received "plus the fair market value of the property (other than money) received" for the property sold. While, as stated, we disagree with the respondent's inclusion of the security deeds at 100 per cent of face value, we do not agree with the petitioner that their fair market value was as low as 30 per cent of face. We have carefully compiled and examined such evidence as we have relating to the properties sold. In some instances the property was sold with *152 no down payment or with a small down payment. In other instances substantial down payments were made. The value of a security deed obviously will vary according to the value of the underlying property. The value of the properties would represent varying percentages of the face amount of the deeds. The petitioner's witnesses testified as to their opinion of the values of the various properties sold and in those instances in which we know the amount of the security deed, we have compared the amount of such deed with the opinion evidence as to the value of the realty. We find that the average of the values of the real estate stated by the witnesses represents over 56 per cent of the face amount of the security deeds. We fail to see how the security deeds could be considered as having a value less than the actual fair market value of the security behind them and believe that they are worth considerably more. From the record it seems apparent that in most instances the petitioner received down payments and subsequent installment payments, although there were some repossessions. The petitioner's evidence, meager as it is, shows that within the years in which sales were made he received substantial *153 collections on the sales. Taking into consideration all the evidence, it is our best judgment and we have found as a fact, that the security deeds taken back by the petitioner upon the sale of properties had an average fair market value of 70 per cent of their face amounts. We have included them at that percentage in our reconstruction of the petitioner's net worth. The foregoing discussion relates to the security deeds received by the petitioner in connection with sales of real estate. He also owned other security deeds to secure debts not the result of real estate sales. There is no detailed evidence in the record concerning the petitioner's acquisition of these security deeds or as to the security behind them. For all we know the petitioner may have loaned the full face amounts of these deeds and their cost may be represented by such face amounts. In any event, for lack of evidence to the contrary, we have included these security deeds in the recomputation of net worth at face amounts. Liabilities The petitioner contends that in determining his liabilities as of December 31, 1946, 1947 and 1948 the respondent erred in not taking into consideration an amount which he owed to a *154 person by the name of E. R. Senn. He testified that on April 3, 1946, he borrowed $55,000 from Senn and then on May 10, 1947, he borrowed an additional $30,000 from Senn. He placed in evidence notes in those amounts bearing those dates and payable four years and two years, respectively, after those dates to Senn, bearing four per cent interest. Both notes bear undated face endorsements which read, "Paid - E. R. Senn." The petitioner testified that E. R. Senn was a friend whom he had known for years and who lived in Augusta, Georgia, in one room in a rooming house; that such rooming house has now been torn down; that he had met Senn through a mutual acquaintance, who had died before the time of the hearing; that Senn was retired; that he did not know where Senn got his money; that Senn had no family in Augusta; that he did not know where Senn kept his money, but that he didn't keep it in banks because he did not like banks; that the money which he borrowed from Senn was carried by Senn in a suitcase in 10 and 20 dollar bills; that they counted the money in a pine thicket in the woods where no one would bother them; that he buried the money he received; that he gave Senn no collateral *155 or security; that he did not pay interest on the notes; that for a time he hid the $30,000 under some building supplies in a shop near his house, before burying it; that after the $30,000 loan Senn went to Florida to live; that in 1950 he sold some securities, dug up some money and repaid Senn $31,000; that this repayment took place in Miami at a rooming house, the address of which the petitioner does not remember; that Senn never wrote him letters, but that he knew where Senn lived in Miami because he told him where he was going before he left; that Senn marked the two notes paid and the petitioner gave him a new note for $54,000; and that he paid the remainder off to Senn in 1953 or 1954. This testimony of the petitioner is wholly uncorroborated. The petitioner did not bring Senn to the hearing of this case nor did he explain why he did not. Nor was any witness produced who had known Senn. There is no indication in any of the petitioner's records or in his financial statements to the banks that he owed this amount. Considering the relative size of this item and its importance to the petitioner's contention it would seem that if he had borrowed this large amount from Senn he would *156 have produced him as a witness or shown efforts to produce him. In our opinion the testimony is so improbable that we have not considered it as a valid foundation for any findings of fact. Carmack v. Commissioner, supra.We have not used the alleged Senn transactions in any way in arriving at the petitioner's net worth. The amounts that we have found as the petitioner's indebtedness on notes and accumulated depreciation are the amounts set out in joint exhibits filed at the trial. Although there was some controversy as to accounts payable at the close of the years 1946, 1947 and 1948 we are satisfied that the petitioner owed the amounts shown in exhibits introduced by him at the hearing and have so found in the findings of fact. Living Expenses In his determination of deficiencies the respondent used the figure of $2,000 as representing the amount of the petitioner's living expenses for each of the years 1941 to 1944, inclusive, $2,500 for each of the years 1945 and 1946, and $3,000 for each of the years 1947 and 1948. He added those amounts to his determined increases in net worth for the several years. On brief, he contends that the same amounts should be used in the reconstruction. *157 The petitioner contends that those figures are too high and refers us to his testimony as to his frugal habits and his estimate of living expenses in the amount of $500 or $600 a year. We have set out in the findings some of the record facts as to the petitioner's frugality. Giving full credence to his testimony on this point, we cannot but believe that he underestimated the total of the living costs of himself and his family. Throughout the period 1941 to 1946 he claimed three exemptions in his returns - one each for himself, his wife and his daughter, Betty. For the year 1948 he claimed exemptions for himself and his wife. We find it difficult to believe that a family of this size, living in or near a city, spent only $500 or $600 a year for living expenses. The estimate of the petitioner does not stand the test of analysis. He allowed his wife $20 a month for clothing and his grocery bill he estimated at $4 to $5 per week. Those two items would amount to close to $500 a year. And, of course, he must have incurred some costs for utilities, maintenance of his residence, feed for his cows, perhaps medical expenses and other personal items. Exercising our best judgment upon the record, *158 we conclude and have found as a fact that the sum of $1,000 per year is a reasonable allowance for living expenses and we have used that amount in the reconstruction of the petitioner's income. Capital Gains The petitioner contends that 58 parcels of property sold in the years 1942 to 1948, inclusive, were rental properties which had been held for more than six months, that depreciation had been allowed thereon, that therefore the gains derived from the sales thereof should be treated as long-term capital gains under section 117(j) of the Internal Revenue Code of 1939[1] *159 , rather than as ordinary income, and that 50 per cent of such gains should be excluded from taxable income. We think there can be no doubt that the petitioner was in the business of selling real estate. In fact, he admittedly constructed many houses for sale. His real estate activities over a long period of years included the purchase and sale of improved and unimproved lands, the purchase and subdivision of vacant land, the construction *160 of houses thereon and the rental and sale of those houses, and the purchase of improved properties and the rental and sale thereof. We note the continuity, numbers, frequency and substantiality of sales of real estate as distinguished from isolated transactions. The fact that the petitioner did not employ an agent or otherwise affirmatively engage in a selling campaign is not decisive. Oliver v. Commissioner (C.A. 4), 138 Fed. (2d) 910, affirming a decision of this Court [2 TCM 78,]., Gruver v. Commissioner (C.A. 4), 142 Fed. (2d) 363, affirming 1 T.C. 1204; Mauldin v. Commissioner (C.A. 10), 195 Fed. (2d) 714, affirming 16 T.C. 698. The precise question presented here by the petitioner is whether the particular properties referred to by him constituted properties which were at the time of sale thereof, held primarily for sale to customers in the ordinary course of that business. The respondent's denial of capital gain treatment presumably rests on a correct determination of the facts and the burden is upon the petitioner to establish error in that determination. Alice E. Cohn, 21 T.C. 90, affd. (C.A. 9), 226 Fed. (2d) 22. There is no single test which may be applied in determining *161 whether property sold was at the time of sale held primarily for sale to customers in the ordinary course of business. The determination depends upon all the background and circumstances. Alice E. Cohn, supra; Consolidated Naval Stores Co. v. Fahs (C.A. 5), 227 Fed. (2d) 923. This is essentially a factual question. Winnick v. Commissioner (C.A. 6), 223 Fed. (2d) 266, affirming 21 T.C. 1029; Alice E. Cohn, supra, and cited cases therein. While the purpose for which property was acquired is a factor to be considered, the ultimate question is the purpose for which the property was held at the time of sale. Richards v. Commissioner (C.A. 9), 81 Fed. (2d) 369, affirming 30 B.T.A. 1131; Rollingwood Corporation v. Commissioner (C.A. 9), 190 Fed. (2d) 263, affirming a decision of this Court [9 TCM 597]. Even though the taxpayer may continue to rent property pending sale, this does not in itself indicate that the property at the time was not held primarily for sale to customers. Rollingwood v. Commissioner, supra. These particular properties to which the petitioner refers were sold over a period of years during which sales of other properties were being made and during which the *162 petitioner was also acquiring additional property. The petitioner constructed at least 23 other houses for sale and sold 20 of them in the years 1946, 1947 and 1948. Schedules submitted by the respondent in explanation of his determination indicate many other purchases and sales of property throughout the taxable years before us, and as to those the petitioner has introduced no evidence. The 58 properties in question were not, as in the case of D. L. Phillips, 24 T.C. 435, confined to a particular area clearly identified for investment. The properties the petitioner sold were scattered over a rather wide area. For instance, some were on Chaffee Avenue, some were in the Druid Hills subdivision and some were in the Sand Bar Ferry Road tract. Nor is there any showing here, as in the Phillips case, that the petitioner refused any offers to purchase the properties. On the contrary, it is shown that the petitioner was willing to sell any of his property to anyone who wanted to buy. Some of his testimony as to the properties with which we are here concerned was as follows: "Q. Mr. Anderson, will you tell us under what conditions you sold this property? "A. Just sell it to anyone that wanted *163 to buy it, if he had any money. Sometimes I sold it without any money. "Q. Did you solicit them or did they solicit you? "A. Most every case they come to me or their brother-in-law or sister, some family connection. "Q. That is, somebody in the neighborhood wanted a relative or friend to move in the neighborhood? "A. Sometimes I paid a commission to somebody outside of the agent. He said, 'I will sell that house if you give me fifty dollars.' But he was not an agent. He was sometimes a brother-in-law." In the light of the petitioner's testimony, together with the record as a whole, we cannot find that any of the properties, even though they may have been acquired originally for rental purposes, were not held primarily for sale to customers at the time they were sold. We are not persuaded that in the years in which the 58 pieces of property were sold they were held for any different purpose than other properties which were being sold in that period. In the years in question his primary object seems to have been that of selling his properties at a profit. There is no evidence here that the petitioner had segregated properties for the definite purpose of holding them for investment and *164 that he had embarked on a program of liquidation thereof such as has been held in some cases to require a holding of capital gain upon the sale of rental properties. We have examined the cases cited by the petitioner but find that they are not governing in the circumstances which we find present in the instant case. In Goldberg v. Commissioner (C.A. 5), 223 Fed. (2d) 709, reversing 22 T.C. 533, the court found that the taxpayer had not been in the business of selling real estate, but rather in the business of holding real estate for investment and that sales of such property within a comparatively short time constituted a liquidation of the rental business. The court there recognized that if an owner was contemporaneously, or soon before or after, buying or selling other property on his own account as a dealer, appellate courts have found that such evidence supports factual findings resulting in the denial of capital gain benefits with respect to the rental properties sold. Not only has the petitioner failed to show error on the part of the respondent, but we think the evidence establishes as a fact, and we have so found, that all the real estate sold by the petitioner was property *165 held by him primarily for sale to customers in the ordinary course of his business. Accordingly, in our reconstruction of the petitioner's taxable income under the net worth method we have not made any adjustment on account of claimed long-term capital gains. Installment Basis In his return for the year 1948 the petitioner computed and reported income from the sales of nine parcels of real estate on the installment basis. He contends that the initial payments do not exceed 30 per cent of the selling price and that he is therefore entitled to use the installment basis under the provisions of section 44(b) of the Internal Revenue Code of 1939. The respondent, on the other hand, in computing the deficiency refused to allow the reporting of this income on the installment basis. Section 44(b) provides that: "In the case * * * of a sale or other disposition of real property, if * * * the initial payments do not exceed 30 per centum of the selling price * * * the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. As used in this section the term 'initial payments' means *166 the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made." The basis and manner precribed in that section is to return as income in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price. Section 29.44-2 of Regulations 111, provides: "* * * The term 'initial payments' contemplates at least one other payment in addition to the initial payment. If the entire purchase price is to be paid in a lump sum in a later year, there being no payment during the first year, the income may not be returned on the installment basis. Income may not be returned on the installment basis where no payment in cash or property, other than evidences of indebtedness of the purchaser, is received during the first year, the purchaser having promised to make two or more payments in later years." Although the installment plan for reporting profits does not depend upon any prescribed method of bookkeeping or accounting, it is necessary that the accounts kept *167 by the petitioner permit a correct determination of tax liability by the installment method. Acme Lumber Co., 25 B.T.A. 403. As stated hereinabove, in connection with the net worth method issue, the records of the petitioner are inadequate to establish the amount of income under any method of accounting. They do not contain complete data as to cost of properties or payments received. Furthermore, the petitioner has not presented evidence to show that all the requirements set forth in the regulations have been met in the case of the nine sales in question. The respondent having determined that the petitioner is not entitled to use the installment method of accounting, the burden is upon the petitioner to clearly show that he is entitled to use that method and thus postpone the taxation of income. We hold that the petitioner has failed to show that he is entitled to the use of the installment method for the nine parcels for the year 1948. Fraud Issue For each of the years 1941 to 1948, inclusive, the respondent has made 50 per cent additions to the deficiencies computed by him, asserting that some part of each deficiency is due to fraud with intent to evade tax. Section 293(b), Internal Revenuecode of 1939. *168 [2] For the years 1941 to 1946, inclusive, the respondent alleges that the returns were false and fraudulent with intent to evade tax and that therefore the statute of limitations does not bar assessment for the years 1941, 1942 and 1943 as contended by the petitioner. Section 276(a), Internal Revenue Code of 1939. [3]
In any proceeding involving the issue of whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof is upon the respondent. Section 1112, Internal Revenue Code of 1939. And the fraud must be proved *169 by clear and convincing evidence. Frank Imburgia, supra.However, in determining whether the respondent has established fraud on the part of the petitioner we may consider the entire record and are not limited to respondent's affirmative evidence on the fraud issue. Frank Imburgia, supra; Wallace H. Petit, 10 T.C. 1253; L. Schepp Co., 25 B.T.A. 418 [419]. Our reconstruction of the petitioner's net worth discloses that there was in each of the years 1941 to 1946, inclusive, unreported taxable income in substantial amounts. The amounts of income (net or gross) shown by the petitioner on his returns for those years and the amounts of net income resulting from our reconstruction of net worth are as follows: Correct Amount
Year
Amount on Returns
of Net Income
1941
$1,426.03 net income
$ 3,088.61
1942
2,390.80 net income
12,624.76
1943
2,060.91 net income
10,135.70
1944
4,754.05 gross income
5,959.27
1945
4,171.70 gross income
23,559.67
1946
1,596.01 gross income
25,944.64
The principal reason for the respondent's assertion that the petitioner has been guilty of fraud is his failure to return any profits on the sales of real estate. So far as we are informed by the record there were no sales of real estate *170 in the year 1941 and we know of only one sale in 1944 and the petitioner made reference to that sale in his return for that year. While the amount of face value of security deeds and other debts owing to the petitioner would seem to indicate that the petitioner should have returned more interest in those years, the respondent makes no point of this and we are without evidence as to the precise amount of the interest actually received. Under the circumstances the respondent has failed to prove by clear and convincing evidence that the return for 1941 was false or fraudulent with intent to evade tax and accordingly the statute of limitations bars assessment of any deficiency for that year. He has also failed to show that any part of the deficiency for 1944 was due to fraud with intent to evade tax and there is no basis for the assertion of a 50 per cent addition to the deficiency. The evidence shows that there were five sales in 1942 at a profit. In that year the petitioner accounted for one sale but not the others. In 1943 there were at least two sales at a profit for which the petitioner did not account in his return. For that year he did refer in his return to two sales, one at a *171 slight profit and one at a loss, but made no reference to the other two which were made at a profit. During 1945 and 1946 the petitioner sold 37 pieces of property at a profit and in his returns for those years made no reference to them. The petitioner states that his reason for not returning profit upon the sales in the various years was because he thought he was entitled to recover his cost, apparently in cash, before he was required to report any profit. He also refers to the fact that there was no ready market for such deeds and that if he could dispose of them it would be at a large discount. Without more we might very well conclude that the petitioner's explanation is plausible and that his failure to return profits on the sales was not induced by an intent to fraudulently evade taxes. However, we find that the petitioner's conduct was not consistent with the view that he acted in good faith in failing to report his gains. The evidence shows that on his return for the year 1942 the petitioner showed two sales at a net loss of $107. One sale was reported as resulting in a gain and the other in a loss. The sale resulting in a gain involved property at 822 Chaffee Avenue which was *172 reported by the petitioner at a gain of $250. The cost of this property was $2,250 and the selling price was $2,500. The petitioner took back a security deed on this sale in the amount of $1,000, which was satisfied in 1944. Thus, it is quite apparent that in 1942 the petitioner recognized that gain on sales is taxable before cash is received in an amount equal to the basis of the property sold. Yet in that very year, as pointed out above, he failed to report gains on other sales. Furthermore, if the petitioner were sincere in his contention, he would be expected, on his theory, to report any gain on a particular sale at such time as the cost was recovered. His returns for the years before us fail to show any instance in which he has carried through and reported gain on sales made in prior years. At the same time we have ascertained from the evidence of record that in a number of instances security deeds were satisfied within the taxable years under review and in those instances the petitioner did not make a final accounting of the transactions in his return for the years in which the security deeds were satisfied. Examples are sale of 1111 Emmett Street in 1945 - security deed satisfied *173 in 1946; sale of 412 Sand Bar Ferry Road in 1945 - security deed satisfied in 1946; sale to Truluck in Brookside in 1945 - security deed satisfied in 1946; and sale to Crapps in Forest Place in 1946 - security deed satisfied in 1948. The petitioner testified that some of his returns were prepared with the assistance of representatives of the Internal Revenue Service. He said that he read figures off a sheet of paper and was prepared to give any information desired. He said he signed his returns thus prepared without reading them. This, of course, cannot excuse the petitioner from filing proper returns. The petitioner is a man of intelligence and large business experience. He obviously is a very keen businessman and undoubtedly knew, either from memory or by notations which he kept, whether and when he made profits. We know from such records as he had that he was meticulous in his accounting with his mother, even accounting for items as low as ten cents. We do not believe that his failure to return the profits in the years of sale or in later years when the security deeds were satisfied was due to ignorance or oversight. Certainly we would expect him to know that interest which he collected *174 from year to year upon his security deeds constituted income at the time collected or at least when the security deeds were finally satisfied. The security deeds bore interest at rates ranging from five per cent to eight per cent. Interest computed at five per cent on the security deeds which the petitioner had outstanding would run far in excess of the small amounts of interest shown on his returns. There is no indication in any of his returns that upon satisfaction of the security deeds any portion of the amount received was returned as interest. Under all the circumstances of this case we are forced to the conclusion that for the years 1942, 1943, 1945 and 1946 some portion of each deficiency in tax was due to fraud with intent to evade tax and that the returns filed for those years were false or fraudulent with intent to evade tax. We accordingly hold that the petitioner is liable for an additional amount of 50 per cent of any deficiency for those years resulting from our opinion herein. We also hold that the statute of limitations does not bar assessment and collection of the deficiencies and additions thereto for any of such years. The petitioner filed no return for the year *175 1947. At the time for filing his return for 1947 his returns for prior years were under investigation. He had discussions with an accountant and testified to the effect that he thought he had made arrangements to have a return filed for the year and left the matter in the hands of his accountant. Under these circumstances we are not convinced that the petitioner's failure to file a return was due to an intent to evade tax. We hold that the respondent has failed to show that any part of the deficiency for that year was due to fraud with intent to evade tax and accordingly do not approve the additional 50 per cent of the deficiency for that year. For the year 1948 the petitioner did obtain the services of an accountant and apparently attempted to file a proper return. He showed his sales of property and reported interest of over $9,000. As to that year also we hold that the respondent has failed to show that any part of the deficiency is due to fraud with intent to evade tax and we therefore disapprove the 50 per cent addition to the deficiency for that year. Addition to tax under section 291(a) For the year 1947 the respondent has added to the tax 25 per cent thereof because of the *176 petitioner's failure to file a return for that year. Section 291(a) of the 1939 Code provides that where there is a failure to file a timely return a percentage of the tax shall be added, graduated to a maximum of 25 per cent, "unless it is shown that such failure is due to reasonable cause and not due to willful neglect * * *." The petitioner has never filed an income tax return for the year 1947. By way of extenuation the petitioner alleges that he engaged the services of an accountant to prepare his 1947 return; also that revenue agents were in possession of his records at the time the 1947 return was due to be filed so that the filing of an accurate return would have been impossible. The record leaves us in doubt as to the extent of the services that were to be rendered by the accountant who was employed by the petitioner. The accountant's services were engaged by the petitioner in 1947 in connection with the petitioner's 1944 return that was then under investigation by revenue agents. The accountant testified that he was not engaged to prepare and file a return for the year 1947. Even if the accountant was engaged to prepare a 1947 return, the petitioner cannot escape the consequences *177 of the failure to file in view of his failure to furnish the accountant with data which would serve as the basis for preparation of a return. The accountant testified that he was never furnished with records upon which he could prepare a return for 1947. There is in evidence a letter from the petitioner to the accountant, dated September 24, 1949, in which the petitioner refers to having left records with the accountant early in January 1948. However, the evidence shows, and the petitioner testified, that at that time his records were in the possession of the revenue agents. Those records were returned to the petitioner on January 30, 1948. We are satisfied from the evidence that the petitioner did not furnish sufficient information to the accountant to permit the preparation of a return for the year 1947. The few figures given in the petitioner's letter of September 24, 1949, were far from sufficient. Cases which excuse late or non-filing of returns because of reliance on others are predicated on the fact of furnishing of complete information to the adviser upon whom reliance is placed. Hatfried, Inc. v. Commissioner (C.A. 3), 162 Fed. (2d) 628. Here the petitioner did not furnish *178 his accountant with the necessary facts to permit the filing of a return. As no reasonable cause is shown for the failure to file a return, the imposition of the addition is sustained. See Tarbox Corporation, 6 T.C. 35, Calvert Iron Works, Inc., 26 T.C. - (June 29, 1956). Additions under subsection (d)(1)(A) and (d)(2) of section 294 of the 1939 Code By amendment to answers the respondent seeks to add to the tax the additional amount provided for in section 294(d)(1)(A) for the years 1947 and 1948 (he abandoned such claim as to the year 1943) and to add to the tax for each of the years 1943, 1946, 1947 and 1948 the additional amount imposed by section 294(d)(2) of the 1939 Code. Section 294(d)(1)(A) provides for an additional amount in the case of a failure to make and file a timely declaration of estimated tax, unless such failure is due to reasonable cause and not to willful neglect. The burden of proof upon this issue is upon the respondent since it is new matter pleaded in his answer. Rule 32, Rules of Practice of this Court. The only thing that the respondent has shown is that the petitioner did not file the declarations of estimated tax for the years 1947 and 1948. The delinquency *179 may have been due to reasonable cause for all that is shown on the record. We find that the respondent has not borne his burden of proof and that there is no justification for the assertion of the additions to the tax under section 294(d)(1)(A) of the 1939 Code for failure to file declarations for those years. See Bruner Woolen Co., Inc., 6 B.T.A. 881. Section 294(d)(2) provides for an addition to the tax in the event 80 per cent of the correct tax liability exceeds the estimated tax. The statute does not provide for any extenuating circumstances. ( H. R. Smith, 20 T.C. 663.) Here 80 per cent of the tax as recomputed in accordance with this opinion will exceed the estimated tax and accordingly the additions under section 294(d)(2) will apply. Where no declaration has been filed, as is the situation here for the years 1947 and 1948, we have held that the amount of the estimated tax is to be considered as zero for the purpose of computing the amount of the addition. G. E. Fuller, 20 T.C. 308 (affd. without discussion of this point, 213 Fed. (2d) 102); Harry Hartley, 23 T.C. 353 and 23 T.C. 564. For the year 1943 the respondent alternatively requests an increase in the deficiency *180 in the event we decide that the petitioner is not liable for an addition for fraud for the year 1942. The claim for such addition is made under section 6 of the Current Tax Payment Act of 1943. That section, as the respondent recognizes, does not apply where additions to the tax for 1942 "are applicable by reason of fraud." As we have sustained the respondent's determination that a part of the deficiency for 1942 is due to fraud, the claimed increase for 1943 under the Current Tax Payment Act may not be made. Decisions will be entered under Rule 50. Footnotes
*. The two sales involved property on Skinner Road sold to J. P. Morris, and property at 420 Sand Bar Ferry Road sold to Mrs. S. Pollard.↩
*. The sales reported were of a brick house at a reported gain of $4.15 and a farm at a loss of $1.40. The return does not refer to the sales in 1943, hereinabove mentioned, to J. P. Morris and Mrs. S. Pollard.↩
*. Dividends and interest.↩
1. Citizens & Southern National Bank. 2. Georgia Railroad Bank & Trust Company. ↩
3. Citizens & Southern National Bank - Personal Checking Account.↩
a. After deduction of $5,000 for depreciation. ↩
b. After deduction of $12,000 for depreciation. ↩
c. Including $60,000 reserve for losses.↩
1. Section 117(j) provides in part: (1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * * (2) General Rule. - If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion * * * of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets.↩
2. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2)↩. 3. SEC. 276. SAME - EXCEPTIONS. (a) False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.↩