RONALD E. NEWMAN, SR., a/k/a RONNY NEWMAN, AND MARY JEAN NEWMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Newman
Docket No. 5768-90
United States Tax Court
T.C. Memo 1992-652; 1992 Tax Ct. Memo LEXIS 696; 64 T.C.M. (CCH) 1265; November 9, 1992, Filed *696 Decision will be entered for respondent as to Ronald E. Newman, and for petitioner as to Mary Jean Newman. For Petitioners: Keith H. Johnson. For Respondent: Charles A. Baer. PARR
PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income tax: Additions to Tax
Year
Deficiency
Sec. 6653(b)
Sec. 6654
1977
$ 22,130
$ 11,231
$ 720
1978
23,503
11,752
720
1979
16,331
8,166
714
The issues for decision are: (1) Whether petitioners received unreported taxable income in each of the years at issue; (2) whether respondent proved by clear and convincing evidence that petitioners are liable for additions to tax for fraud pursuant to section 6653(b); [1] (3) whether petitioners are liable for additions to tax for underpayment of estimated tax pursuant to section 6654; (4) whether respondent is barred by the statute of limitations from assessing tax liability for petitioners' 1977, 1978, and 1979 taxable years; (5) whether petitioners are entitled to an abatement of any interest attributable to a tax deficiency for the years in issue pursuant to section 6404(e); and (6) *697 whether Mary Jean Newman is entitled to relief as an innocent spouse. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the attached exhibits, is incorporated herein by this reference. At the time they filed their petition, petitioners resided in Gainesville, Florida. References to petitioner in the singular are to Ronald E. Newman, Sr., a.k.a. Ronny Newman. In September 1976, petitioner was arrested in Texas for possession of marijuana. Petitioner and another individual unsuccessfully attempted to bring 378 pounds of marijuana into the United States through a U.S. Border Patrol inspection point. Mr. Newman was paid $ 25,000 to transport this marijuana, received the funds, and subsequently failed to report the proceeds on his 1977 Federal income *698 tax return. Petitioner was involved in other illegal drug activities in addition to the 1976 Texas incident which resulted in his arrest. These other activities included several incidents where petitioner invested money with other people in marijuana deals and received proceeds in return. On September 29, 1976, a 1976 Ford F250 pickup truck, registered in petitioner's name, was seized by the United States Customs Service near St. Augustine, Florida. The truck was involved in the towing of a boat seized earlier that same day for transporting marijuana. During 1976, petitioner became associated with Gator Tractor. Petitioner operated the business, which primarily bought and sold used tractors and farm equipment. During the years in issue, petitioner was involved in a myriad of business ventures and transactions. In many of these business ventures, petitioner was associated with John D. Odom III. These ventures included purchases and sales of galvanized metal to construct barns, cattle, real estate, and numerous other types of businesses. The form of these ventures resembled a partnership, but the proceeds were not always divided equally. The division of profits depended primarily *699 on the amount of cash each partner possessed at the time, other projects they were currently involved in, and any outstanding debts that existed between them. In his business ventures with John Odom, petitioner always maintained the books and the financial end of the partnership. If John Odom needed any money he would call petitioner, request the necessary amount, and subsequently receive a check issued by petitioner. Whenever a deal was completed, petitioner and John Odom performed an internal accounting. After loans were taken out and proceeds put back in, the final amounts remaining from all of their business dealings, if any, were distributed. Petitioner and John Odom were also involved in a business called Sunshine Seafood Co. Records supplied by petitioner show the first company transaction to have occurred on August 4, 1977. The business involved the buying and selling of shrimp and oysters from petitioner's older brother, Albert Newman, who lived in New Orleans. John Odom and petitioner leased a building in Gainesville, Florida, that contained the necessary refrigeration. Albert Newman would buy the seafood off the boats as they came into New Orleans, subsequently *700 ship the seafood to petitioner, and then receive the money from petitioner via the truck driver. Petitioner and John Odom would receive these shipments on a weekly basis. The business was sold after it had been in operation for approximately 1 year. Petitioner was also involved in many business transactions with Philip Odom. A majority of these transactions were in the cattle business. Philip Odom and petitioner kept livestock on land rented from Art Niewnow. The land was leased directly to petitioner for the years 1977 and 1978. The second lease, in 1978, contained a clause that granted petitioner the option to purchase the land. In August 1979, petitioner sold Philip Odom thirty head of cattle for $ 18,000. Another transaction that occurred in 1979 was petitioner's purchase of a truck stop from Sportsman's World, Inc. In addition to the truck stop, the purchased property included a restaurant, a bar, and a salvage business. Petitioner subsequently incorporated the business as Starke Truck Plaza, Inc. The restaurant was leased to a franchise named Skeeter's. After selling most of the diesel fuel and gas, petitioner leased the truck stop to Eddie Jackson, who subsequently *701 managed the facility. According to the agreement with Jackson, petitioner received a certain amount from each gallon pumped. Petitioner also entered into a lease agreement with Ralph Goodman to operate the bar. Petitioner pleaded guilty to violating section 7206(1) for tax year 1977 as charged in a one-count information: On or about the 15th day of April, 1980 in the Northern District of Florida, and elsewhere, RONALD E. NEWMAN a resident of Putnam County, Florida, did wilfully and knowingly make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 1977, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which said income tax return he did not believe to be true and correct as to every material matter in that said return reported adjusted gross income for the calendar year of 1977 in the amount of $ 9,327.00, whereas, as he then and there well knew and believed, his adjusted gross income for said calendar year was $ 62,659.63. Pursuant to an order of the United States District Court for the Northern District of Florida, petitioner was sentenced to 2 years' *702 imprisonment and a $ 5,000 fine. On September 12, 1986, Mr. Newman began serving his prison sentence. None of the above-mentioned transactions or any of petitioner's business dealings were discussed directly with his wife, Mary Jean Newman. She was never approached by her husband for any advice or consultation on any business dealings, nor was she ever apprised of the nature and extent of his financial assets. Mrs. Newman has only a high school education, except for a few courses at the local community college. She has had no specialized tax or bookkeeping training or work experience. However, she did manage the restaurant at the truck stop between 1974 and 1975, before her husband purchased it. During the years at issue, she never performed any bookkeeping or posting of ledgers in her husband's businesses. Respondent issued a notice of deficiency to petitioners on August 31, 1988. In the notice, respondent determined that petitioners' net worth increased from $ 38,374.96 on December 31, 1976, to $ 208,011.89 on December 31, 1979. By using the net worth method to reconstruct petitioners' income, respondent concluded that petitioners failed to report income in the amounts *703 of $ 53,333 for 1977; $ 58,625 for 1978; and $ 53,611 for 1979. OPINION Unreported Taxable Income
Respondent determined deficiencies in petitioners' Federal income tax for the taxable years of 1977, 1978, and 1979. Respondent's determination is presumed correct and petitioners bear the burden of proving respondent erred. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). In the case at hand, petitioners failed to maintain a complete and adequate set of books and records regarding their income-producing activities during the taxable years in issue as required by section 6001.[2] The amounts of petitioners' income, deductions, and other items required to be shown on their Federal income tax returns for each of the years in issue could not be readily ascertained from the information submitted to respondent. Under the authority of section 446, respondent can reconstruct the taxpayer's income by applying a method that, in her opinion, clearly reflects actual income. Sec. 446(b); Petzoldt v. Commissioner, 92 T.C. 661, 687 (1989). *704 Respondent's use of the "net worth" method is sanctioned by her authority to reconstruct income generally. Holland v. United States, 348 U.S. 121 (1954); sec. 1.446-1, Income Tax Regs. The net worth theory is based on the proposition that if the increase in a taxpayer's net worth plus his nondeductible expenditures for a specific year exceed his reported net income for that year, the excess will constitute unreported taxable income. Estate of Cardulla v. Commissioner, T.C. Memo 1986-307 (citing 2 Mertens, Law of Federal Income Taxation, sec. 12.112, at 453 (1985 rev.)). In Holland, [3] the Court suggested precautions in the use of the net worth method. The first essential condition is to establish, with reasonable certainty, an opening net worth to serve as a starting point from which to calculate future increases in the taxpayer's assets. Secondly,the Government must investigate leads furnished by the taxpayer, when practical, that might establish the taxpayer's innocence. Finally, the increases in net worth must be attributable to taxable income. Id. at 132-138. The Court explained that the last requirement *705 could be satisfied by showing a likely source from which the finder of fact could reasonably find that the increase in net worth originated. Holland v. United States, supra at 137-138. The difference between opening and closing net worth for a year is an important factor in reconstructing gross income. Net worth is measured by the excess of assets over liabilities. Therefore, a taxpayer will frequently allege outstanding loans or obligations, *706 such as personal debts, in reduction of his closing net worth. The increase in net worth is then adjusted accordingly: (1) Expenditures for nondeductible items (taxpayer's personal living expenses) are added to the increase in net worth; (2) any nondeductible portion of capital losses and any nondeductible losses sustained in the disposition of personal assets are added to the net worth increase; and (3) such increase must be decreased by the total of any nontaxable income (gifts, inheritance, tax-exempt interest) received during the disputed period. Estate of Cardulla v. Commissioner, supra.
Petitioners admit to the accuracy of respondent's net worth computation except that they contend the following claims be taken into account: (1) Louise Newman loaned them $ 10,600 prior to 1976 and that the loan was still in existence from 1977 to 1979. (2) Johnny Bates loaned them $ 8,000 in 1976 and that the loan was still in existence from 1977 to 1979. (3) The 1976 Ford F250 pickup truck seized by U.S. Customs was sold to Jimmy Davis prior to the seizure. (4) They routinely maintained $ 8,000 to $ 10,000 cash on hand from 1976 to 1979, as opposed *707 to the zero cash on hand stated by respondent in the net worth statement. (5) The Intertechnology Solar stock was owned by John Odom from the years 1977 to 1979. (6) Tommy Newman loaned them $ 50,000 in 1977. The loan was still in existence in 1978 and had an outstanding balance of $ 49,500 in 1979. (7) Ralph Goodman loaned them the following amounts on the dates specified: October 27, 1977
$ 9,500 May 30, 1979
$ 22,000
June 3, 1979
$ 9,000 (8) Their investment in $ 10,716 worth of galvanized metal purchased in 1977 used in constructing a shed on the Niewnow Farm property should be limited to $ 3,572, representing their one-third investment. (9) Jimmy Newman loaned them $ 10,000 in 1978, with an outstanding balance of $ 9,500 in 1979. (10) James Harris paid off a $ 4,125 note receivable payable to Newman prior to December 31, 1979. (11) The beginning inventory for the Backdoor Lounge, purchased by petitioners, should reflect an amount of $ 5,857.61 rather than $ 2,857.61. (12) The net worth statement is overstated by $ 59,000, the amount paid for the beginning inventory (fuel, restaurant equipment, marble, etc.) in the truck stop, because a substantial portion *708 was sold by petitioner before the premises were leased several months later. (13) Philip Odom loaned them $ 18,000 in 1979. (14) The $ 30,000 cash used to purchase an option for the Niewnow Farm property was advanced by Philip Odom rather than petitioner. (15) Respondent's use of Bureau of Labor statistics for petitioners' personal living expenses is overstated because they maintained a personal garden for each of the years at issue and lived a simple and moderate existence during the years in issue. (16) A 1973 Stamas boat, from petitioners' salvage business, was traded for a diesel Volkswagen Rabbit automobile. The boat had a higher basis than was allowed in the trade, thus creating a business loss that was erroneously excluded from their 1979 Federal income tax return. (17) A 1979 Chevrolet pickup truck owned by petitioners was totally destroyed in a fire, resulting in a casualty loss that should have been deducted on the 1979 Federal income tax return.
a. Opening Net Worth
The most frequently contested item in the calculation of opening net worth is opening cash on hand. Petitioners allege that they routinely maintained $ 8,000 to $ 10,000 in cash from 1976 to 1979, *709 as opposed to the zero cash on hand stated by respondent on the net worth statement. Petitioners failed to offer any evidence sufficient to rebut the presumption that respondent's calculations are correct. In any case, as the cash on hand allegedly continued relatively unchanged throughout the periods in issue, it should have no effect on the net worth computation. Because the net worth method only measures the difference between the years, a constant figure would have no effect. In an attempt to increase their opening net worth and thus decrease the overall difference, petitioners allege that Louise Newman loaned them $ 10,600 prior to 1976 and the loan remained in existence through 1979. Petitioner did introduce a copy of his ledger showing repayment and the actual loan his mother signed. However, Mr. Songer of the Internal Revenue Service testified that if the loans in 1976 were increased to reflect this loan, the amount would remain constant throughout the years in issue. As a consequence, the unreported income would not change because the method only measures the difference between the years. We agree with his conclusions and find that this loan is inconsequential to *710 our determination. Petitioners also failed to adequately prove the existence of an alleged loan of $ 8,000 in 1976 from Johnny Bates. This loan was uncorroborated by any note or security agreement. We are unpersuaded by Mr. Bates' testimony that he borrowed the amount from a third party to lend to petitioner. More importantly, Mr. Bates testified that the loan was repaid within an 8-month to 2-year period. If that testimony is true, petitioners' net worth and income for the years in dispute are even more than the amounts computed by respondent. Finally, petitioners allege that they sold the Ford pickup truck before it was seized by the United States Customs Service in 1976. A U.S. Customs Service investigator testified that the truck seized was registered to petitioner. Petitioners failed to introduce any evidence to the contrary or any documentation of an increase in assets, cash, or receivables from the alleged sale. Therefore, we find petitioners' arguments unpersuasive and conclude that respondent properly included the pickup truck in the net worth computation. b. Adjustments and Closing Net Worth
The alleged loan from petitioner's brother, Jimmy Newman, is similarly *711 uncorroborated by any credible evidence. Jimmy Newman testified that he received cash from the sale of some property in south Florida, and thus had the money to loan to his brother without any signed note and without charging any interest. Petitioner offered as evidence his ledger showing repayment to his older brother. Only two of the checks shown are actually made out to Tommy Newman; the remainder are made out to cash or petitioner himself. Again, petitioner failed to provide us with any credible evidence of the existence of this loan. The purported $ 18,000 loan from Philip Odom, now deceased, to petitioner in January 1979, also casts some serious doubts. Petitioner testified that Philip Odom paid him $ 18,000 for the sale of cattle in August 1979. However, petitioner failed to explain why Odom would have paid him in August when petitioner still owed Odom precisely the same amount of money. Again, we find petitioner's arguments unpersuasive. Another family loan in the amount of $ 50,000 was allegedly made by Tommy Newman to petitioner. Petitioner testified that he needed the cash for the buying and selling of livestock and farm equipment. No promissory note was signed. *712 A majority of the checks in repayment of this loan were made to cash. Petitioner's inability to substantiate this loan, other than through his own testimony and inadequate records, forces us to disregard his claim. Although we held the record open to receive Tommy Newman's videotaped testimony, it was never forthcoming. We therefore assume it would have been unfavorable to petitioners. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). The most hotly disputed transactions were the loans allegedly made by Ralph Goodman to petitioners. Mr. Goodman, who was called by respondent, denied that he ever loaned petitioners any money. Mr. Goodman's testimony contained some of the most potentially damaging statements against petitioners' case. However, we give little weight to Mr. Goodman's testimony because he confessed he previously perjured himself before a grand jury in order to protect petitioner. Thus, petitioner and Mr. Goodman take opposite positions and neither is wholly credible. Using our best judgment, we conclude that the loans did not occur. Petitioners *713 consistently deny ownership of Intertechnology Solar stock. They allege that the stock was purchased and actually owned by John Odom, with whom they were involved in a joint business venture. Petitioners' allegations are contradicted by the fact that they actually claimed the 1,500 shares of stock as assets on a residential loan application dated October 17, 1980. Even the testimony of John Odom did not conclusively establish that petitioners were not record owners of the stock. John Odom left open the possibility that the stock was actually purchased with funds out of a joint account with petitioner. Nevertheless, if the stock was purchased out of a joint account with John Odom, petitioners are at least joint owners of the stock. In conclusion, petitioners have failed to rebut the presumptive correctness of respondent's determination and thus the stock was properly included in the net worth computation. Petitioners further allege that the 1977 cash purchase of galvanized metal for $ 10,716 was an investment with two other individuals, each owning a one-third interest. Therefore, petitioner contends that the amount included in the calculation should be reduced to $ 3,572. *714 Petitioner was clearly identified by Mr. Chaney, an employee of the Metal Sales Manufacturing Corp., from whom the purchase was made. Although his testimony leaves open the possibility that another individual, Newnan Bradley, was also involved in the transaction, petitioner failed to substantiate Mr. Bradley's involvement with any additional evidence. Since petitioner failed to meet his burden of establishing that respondent's allocation of the full amount was erroneous, the inclusion of the entire $ 10,716 was proper. Petitioners contend that James Harris paid off a $ 4,125 note receivable prior to December 31, 1979. However, petitioners stipulated to a check dated January 7, 1980, payable to James Harris and endorsed by James Harris and petitioner with a notation referencing the loan from petitioner. Petitioners failed to offer any substantive evidence establishing that the note was paid during any of the years in issue. In reference to their purchase of Sportsman's World Truck Stop, petitioners claim that the $ 59,000 worth of inventory was liquidated during 1979. However, petitioners' claim is contradicted by accounting records and their accountant's notes showing the inclusion *715 of the gasoline inventory in the closing inventory amount. Additionally, petitioner's accountant prepared a tax return for the period August 1, 1979, to July 31, 1980, showing that petitioner's corporation, Starke Plaza, Inc., operated the truck stop into 1980, even though petitioner testified he leased the operation of the gas station to Eddie Jackson several months after the purchase, which occurred on August 3, 1979. The contradiction in testimony and evidence leads to one logical conclusion: petitioner has once again failed to rebut the presumptive correctness of respondent's determination on this item. The remainder of petitioners' claims lack any merit or credibility. Petitioner was unable to establish that Philip Odom advanced him $ 30,000 cash to purchase the Niewnow Farm property. Additionally, Mr. Niewnow's accountant, Mr. Stanley, testified that he deposited $ 30,000 in cash from petitioner into Mr. Niewnow's personal account. Petitioner failed to offer any evidence that established the involvement of Philip Odom in the transaction. Petitioners' claims of a business loss on their 1973 boat and the casualty loss on their 1979 Chevrolet pickup are equally not credible. *716 In both instances, petitioners failed to report these taxable events on their 1979 tax return. Petitioners did not persuasively establish that the boat was actually part of a salvage business. Additionally, they traded the boat in for a car licensed in Mrs. Newman's name, not in the name of the alleged salvage business. Petitioner was even uncertain in his own testimony as to whether the salvage business was under his or the corporation's name. Finally, petitioner admitted that he was satisfied with his insurance recovery on the loss of his truck and had a lot of trouble with the truck prior to the destructive fire. [4] With no evidence introduced to contradict this evidence, petitioners failed to establish that they qualify for either the business or casualty loss deductions. *717 In summary, petitioners have failed to meet their burden of proving that respondent's determination of deficiencies was erroneous. Rule 142(a). Additionally, we are not convinced that respondent's determination was so arbitrary or unreasonable as to lose its presumption of correctness. Anderson v. Commissioner, 250 F.2d 242, 246 (5th Cir. 1957), affg. in part and revg. in part T.C. Memo. 1956-178. In accordance, we conclude that petitioners are liable for the above-mentioned deficiencies for tax years 1977 through 1979. Addition to Tax -- Fraud
The next issue for decision is whether petitioners are liable for the addition to tax for fraud for the 3 taxable years in issue. Section 6653(b) provides, in part, that: "If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment." Pursuant to the terms of section 6653(b), the fraud addition to tax attaches to the entire underpayment even if only a portion of it is actually attributable to fraud. Mensik v. Commissioner, 328 F.2d 147, 150 (7th Cir. 1964), *718 affg. 37 T.C. 703 (1962); Breman v. Commissioner, 66 T.C. 61 (1976). The existence of fraud under section 6653(b) is a question of fact to be determined upon consideration of the entire record. Recklitis v. Commissioner, 91 T.C. 874, 909 (1988). The principal issue in ascertaining whether fraud is present is whether there has been an intentional wrongdoing on the part of the taxpayer with the specific intent of evading a tax known or believed to be properly owing. Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939); [5]Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). *719 Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Korecky v. Commissioner, 781 F.2d 1566, 1568 (11th Cir. 1986), affg. T.C. Memo. 1985-63. Where fraud is determined for more than 1 year, respondent's burden applies individually to each year. Barbuto v. Commissioner, T.C. Memo. 1991-342 (citing Estate of Stein v. Commissioner, 25 T.C. 940, 959-963 (1956), affd. sub nom. Levine v. Commissioner, 250 F.2d 798 (2d Cir. 1958)). To satisfy her burden of proof, respondent must show two things: (1) An underpayment exists; and (2) the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Parks v. Commissioner, 94 T.C. 654, 660-661 (1990); Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989). The first element requires respondent to establish the existence of an underpayment of tax. Section 6653(c) defines underpayment in essentially the same *720 manner as a "deficiency" to mean the amount by which the tax imposed exceeds the amount of tax shown by the taxpayer on his return. Sec. 6211. In the absence of such an underpayment, there is nothing upon which the fraud addition to tax would attach. Jenkins v. United States, 313 F.2d 624, 627 (5th Cir. 1963). To prove an underpayment, the Commissioner is not required to establish the exact amount of the deficiency. However, the Commissioner cannot satisfy her burden by relying solely on petitioners' failure to discharge their burden of proving error in her determination of the deficiencies. Otsuki v. Commissioner, 53 T.C. 96, 106 (1969). Here, respondent determined the underpayment by utilizing the net worth method of reconstructing petitioners' income. Increases in net worth, standing alone, cannot be assumed to be attributable to currently taxable income. But proof of a likely source from which the jury could reasonably find that the net worth increases sprang, is sufficient. * * * Holland v. United States, 348 U.S. 121, 137-138 (1954). In United States v. Massei, 355 U.S. 595 (1958), *721 the Supreme Court subsequently explained that such proof of a likely source of the net worth increase was not mandatory or necessary in every case. The Court held that "should all possible sources of nontaxable income be negatived, there would be no necessity for proof of a likely source." Id. at 595. Therefore, the Holland and Massei decisions dictate that the Government prove a likely source of taxable income or that the Government conduct an investigation of leads reasonably capable of being checked that, if true, would establish petitioner's innocence of fraud. See Kattar v. Commissioner, T.C. Memo. 1984-387. We find that respondent satisfied her burden of proving an underpayment. Respondent adequately negated all possible sources of nontaxable income in her determination of deficiencies for the years in issue. All possible leads provided by petitioners to establish their innocence were sufficiently investigated and addressed. The second element requires respondent to prove fraudulent intent on the part of petitioners. Fraudulent intent must never be imputed or presumed. Webb v. Commissioner, 394 F.2d 366, 380 (5th Cir. 1968), *722 affg. T.C. Memo. 1966-81; Petzoldt v. Commissioner, supra.Due to the frequent difficulty in finding direct proof of a taxpayer's fraudulent intent, fraud may be proved by circumstantial evidence drawn from the entire record. Spies v. United States, 317 U.S. 492, 499 (1943); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Courts have developed various factors or "badges" which tend to establish fraud. Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). These include: (1) A pattern of understatement of income; (2) inadequate records; (3) concealment of assets; (4) income from illegal activities; (5) attempting to conceal illegal activities; (6) implausible or inconsistent explanations of behavior; and (7) dealing in cash. Bradford v. Commissioner, 796 F.2d 303, 308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). These "badges" *723 of fraud exist in this case. The first is a pattern of understatement of income. The mere failure to report income is not in itself adequate evidence of fraudulent intent. Merritt v. Commissioner, 301 F.2d 484 (5th Cir. 1962), affg. T.C. Memo. 1959-172. However, the consistent failure to report substantial amounts of income over a number of years is usually considered to be indicative of fraud. Gromacki v. Commissioner, 361 F.2d 727 (7th Cir. 1966), affg. T.C. Memo. 1964-292. Such a pattern was established in this case by respondent. Petitioner knowingly and intentionally understated substantial amounts of income for the 3 years in issue in order to evade tax. Other badges of fraud are also present in this case. Petitioner kept inadequate records and attempted to conceal his activities through the guise of family loans. He disguised much of his income through loosely constructed partnerships and business ventures with close friends, claiming that loans and income between the partners usually "balanced out", thus relieving either party of the need to report *724 income. Petitioner claimed that ownership of stock was in his partner's name, yet he still claimed the stock as collateral on a loan application and wrote the check to cover the purchase price. Many of petitioner's claims center around his attempt to attribute income and deals to his business partners, thus concealing assets and income. In addition, these claims and explanations were often implausible or inconsistent. Mr. Newman also conducted many of his business activities in cash. He wrote numerous checks to cash and then claimed that he used the cash to pay off the alleged loans from family members and partners. All of these factors lead to the conclusion that petitioner possessed the requisite fraudulent intent. Finally, petitioner was involved in and received income from illegal activities. He was convicted of willfully and knowingly filing a materially false income tax return pursuant to section 7206(1). Unlike a section 7201 conviction, which collaterally estops a taxpayer from asserting a defense to the fraud addition for the same taxable year, Rodney v. Commissioner, 53 T.C. 287 (1969), a conviction or guilty plea under section 7206(1) *725 does not collaterally estop the taxpayer from asserting a defense. However, such guilty plea and conviction may be considered as evidence of an intent to evade payment of a tax known to be due or owing. Wright v. Commissioner, 84 T.C. 636 (1985). In addition to the other indicia of fraud present in this case, plus petitioner's guilty plea and conviction for violating section 7206(1) in tax year 1977, respondent's burden of proving fraud as to that year is satisfied. Petitioner argued that some of the illegal activities to which he has been linked were actually cases of mistaken identity. His brother, Tommy Newman, only 14 months younger than petitioner, has also been convicted of drug charges and was actively engaged in such illegal activity during the years in issue. However, petitioner was unable to substantiate an actual instance where such a mistake in identity occurred. Petitioner freely admitted that he was involved in other illegal drug activities in addition to the 1976 incident which resulted in his arrest. He admits he invested in and received proceeds from these additional activities. Finally, we granted petitioner's motion to leave *726 the record open for 30 days in order to take a video-taped deposition of Tommy Newman in jail. However, we never received any such deposition. These factors lead us to find petitioner's argument unpersuasive. In addition to meeting her burden for tax year 1977, respondent has also met her burden of proving fraud for tax years 1978 and 1979. Petitioner did more than just substantially understate his income for the years in issue. The above indicia indicate that petitioner willfully and knowingly intended to evade the payment of tax for all of the years in issue and therefore is liable for additions to tax under section 6653(b). We must also decide whether Mrs. Newman is liable for fraud. Fraud is not imputed from one spouse to another. Even in the case of a joint tax return, respondent must prove fraud as to each spouse charged with liability for the addition to tax. Sec. 6653(b); Hicks Co. v. Commissioner, 56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972). However, since we find below that Mrs. Newman qualifies as an innocent spouse under section 6013(e), she is not liable for fraud. Addition to Tax *727 -- Section 6654
Respondent determined that petitioners are liable for additions to tax for underpayment of estimated tax pursuant to section 6654. Petitioners have the burden of proving that respondent erred in her determination. Rule 142(a). Petitioner failed to introduce any evidence that respondent erred in determining that the estimated taxes were underpaid. Accordingly, we conclude that petitioner is liable for additions to tax under section 6654. [6]
Statute of Limitations
Petitioners question whether the periods for assessing any tax have expired for the taxable years 1977, 1978 and 1979. Respondent's notice of deficiency reveals that part of the deficiency for each year is attributable to fraud. In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed or a proceeding in court for collection of such *728 tax may begun without assessment at any time. Sec. 6501(c)(1). Accordingly, the period for assessing the deficiencies remains open under the applicable statute of limitations for each of the years in issue. Abatement of Interest -- Section 6404(e)
Petitioners request that we abate a substantial portion of interest attributable to the tax deficiencies for the 3 years in issue because of prolonged and unreasonable delays by respondent. However, we only address tax year 1979 because section 6404(e) was not enacted until 1986, and applies to interest accruing with respect to deficiencies for taxable years beginning after December 31, 1978. See Tax Reform Act of 1986, Pub. L. 99-514, sec. 1563(b)(1), 100 Stat. 2762. Section 6404(e) provides that in the case of any assessment of interest on any deficiency attributable in whole or part to an error or delay by an officer or employee of the Internal Revenue Service, the Secretary may abate the assessment of all or any part of such interest for any period. However, this Court lacks jurisdiction to address this issue. 508 Clinton Street Corp. v. Commissioner, 89 T.C. 352, 357 (1987). We further *729 note that an appeal of this case lies to the Court of Appeals for the Eleventh Circuit and in this regard see Horton Homes, Inc. v. United States, 936 F.2d 548 (11th Cir. 1991); Klein v. Commissioner, 899 F.2d 1149 (11th Cir. 1990).
Innocent Spouse Relief
Petitioners contend that Mrs. Newman qualifies for innocent spouse relief. Respondent has not addressed this issue. The liability for tax due is joint and several when a husband and wife file a joint Federal income tax return. Sec. 6013(d)(3). But relief may be granted to an innocent spouse under the provisions of section 6013(e). Section 6013(e)(1) provides that where: (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such *730 taxable year attributable to such substantial understatement, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such substantial understatement. In order for relief to be afforded, all four statutory requirements must be met. Estate of Jackson v. Commissioner, 72 T.C. 356, 360 (1979). Mrs. Newman bears the burden of proving that she satisfies each element of the requirements of section 6013(e)(1). Welch v. Helvering, 290 U.S. 111 (1933); Bokum v. Commissioner, 94 T.C. 126, 138 (1990). The first requirement is that a joint return was filed for the taxable year in issue. Sec. 6013(e)(1)(A). Mrs. Newman testified that she did not remember signing the 1977 return and that it is not her signature on the 1978 and 1979 returns. A spouse may avoid liability for the tax owed and any additions to tax by showing that the purported joint return was not in fact joint. The spouse must show that she did not intend to file jointly with the other spouse and that *731 her signature on the return was either forged or signed under duress. Pirnia v. Commissioner, T.C. Memo. 1990-444 (citing Brown v. Commissioner, 51 T.C. 116 (1968)). However, Mrs. Newman failed to introduce any credible evidence of forgery, duress, or lack of intent. We find that Mrs. Newman signed the returns and did intend to file joint returns. Section 6013(e)(1)(B) requires that there be a substantial understatement of tax on the return. Substantial understatement means any understatement which exceeds $ 500. Sec. 6013(e)(3). For each of the three years in issue, the amount of understatement clearly exceeds $ 500. Mrs. Newman must establish that she did not know, and had no reason to know, of the omission of income. An objective test is applied: whether a reasonably prudent person in the taxpayer's position had reason to know or would be expected to know of the omissions from gross income. Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Sanders v. United States, 509 F.2d 162, 167 (5th Cir. 1975). *732 The court in Sanders enumerated several factors to be considered in determining whether a spouse had reason to know of omissions of gross income: (1) Whether there were unusual or lavish expenditures, (2) whether the spouse claiming relief participated in business affairs or bookkeeping, and (3) whether the other spouse refused to be forthright about the couple's income. Sanders v. United States, supra; see also Quinn v. Commissioner, 524 F.2d 617 (7th Cir. 1975) (court views as significant the spouse's degree of participation in business affairs or bookkeeping). Mrs. Newman was not substantively involved in her husband's business affairs and dealings. She had no specialized tax or bookkeeping training, and did not perform any bookkeeping for her husband's various business activities. There is no evidence of an extravagant or lavish lifestyle or living accommodations. She was constrained by a limited family budget and even maintained a garden for cooking. Additionally, because her husband dealt in large cash transactions, no evidence would have appeared on joint bank account statements. Therefore, there *733 were no obvious external signals to Mrs. Newman of her husband's substantial business dealings and subsequent understatements of income. We also consider the complexity of Mr. Newman's financial transactions. As the court in Sanders pointed out, "Extremely intricate financial dealings could mask the existence of actual receipts". Sanders v. United States, supra at 169. Mr. Newman had many business partners and a lot of dealing and business transactions were executed between them. Since petitioner did not discuss his business ventures with Mrs. Newman, we find that Mrs. Newman did not know or have reason to know of her husband's substantial understatements of tax. The fourth requirement dictates a factual determination that it is inequitable to hold the spouse seeking relief liable. Sec. 6013(e)(1)(D). In determining whether it is inequitable to hold Mrs. Newman liable for these deficiencies in tax, we consider whether she significantly benefited, directly or indirectly, from the items omitted from gross income. Belk v. Commissioner, 93 T.C. 434, 440 (1989); sec. 1.6013-5(b), Income Tax Regs. However, normal *734 support is not a significant "benefit" for purpose of this determination. Flynn v. Commissioner, 93 T.C. 355, 367 (1989); sec. 1.6013-5(b), Income Tax Regs.
There is no evidence that Mrs. Newman "significantly" benefited from petitioner's substantial omissions from income based on her lifestyle and relative knowledge of her husband's business activities. Accordingly, we find that Mrs. Newman qualifies for innocent spouse relief under section 6013(e). In summary, we conclude that petitioners failed to meet their burden of proving that respondent's determinations of deficiencies were erroneous. Respondent met her burden of proving petitioner Ronald E. Newman is liable for additions to tax under both sections 6653(b) and 6654. We likewise find that respondent is not barred by the statute of limitations from assessing the deficiencies. Because we find that Mrs. Newman qualifies for innocent spouse relief, petitioner is solely liable for the above deficiencies and additions to tax. To reflect the foregoing, Decision will be entered for respondent as to Ronald E. Newman, and for petitioner as to Mary Jean Newman. Footnotes
1. All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. The pertinent provision of sec. 6001 states: Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary may from time to time prescribe. * * * ↩
3. It is important to note that the use of the net worth method is not limited to cases in which the taxpayer does not maintain any books or where his books are inadequate. Holland v. United States, 348 U.S. 121, 131 (1954). The net worth method can be used to test the accuracy of the taxpayers' returns and as evidence of their correct net income. Licari v. Commissioner, 946 F.2d 898 (9th Cir. 1991), affg. without published opinion T.C. Memo. 1990-4↩.
4. The relevant portion of sec. 165 reads as follows: (a) General Rule. -- There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * [Emphasis added.]
Therefore, petitioner having testified that he was satisfied with this insurance recovery on the value of the truck destroyed, he failed to prove that any uncompensated loss would exceed the remaining limitation on deducting a casualty loss (the $ 100 limitation per casualty requirement of sec. 165(c)(3)↩).
5. In Bonner v. City of Prichard, 661 F.2d 1206↩ (11th Cir. 1981) (en banc)), the United States Court of Appeals for the Eleventh Circuit (to which an appeal in this case would lie) adopted as precedent all decisions of the former United States Court of Appeals for the Fifth Circuit prior to Oct. 1, 1981.
6. Mrs. Newman is relieved from joint liability for these additions to tax as result of our ruling that she is an innocent spouse. See infra↩ pp. 27-30.